No. 22-80140

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

---

Petition for Review of Order Granting Class Certification
from the
United States District Court for the Northern District of
California
No. 21-md-2981; No. 20-cv-5761
Hon. District Judge James Donato

---

**ANSWER IN OPPOSITION TO PETITION FOR PERMISSION
TO APPEAL ORDER GRANTING CLASS CERTIFICATION
PURSUANT TO RULE 23(f)**

---

Karma M. Giulianelli
BARTLIT BECK LLP
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
Karma.giulianelli@bartlitbeck.com

Hae Sung Nam
KAPLAN FOX & KILSHEIMER
LLP
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com

*Attorneys for Plaintiffs-Respondents*

# TABLE OF CONTENTS

RESTATEMENT OF THE ISSUES FOR REVIEW ................................. 1

SUMMARY OF THE ARGUMENT .......................................... 1

ARGUMENT ............................................................... 5

I.     Google Fails To Meet The Applicable Standard For Interlocutory Review Under Rule 23(f) ................................. 5

II.    The District Court Did Not Commit Any Manifest Error ...... 8

     A.    The District Court Conducted a Rigorous Analysis ...... 8

     B.    Dr. Singer Applied Well-Established Economic Models Using Real-World Evidence to Establish Common Injury and Damages ...................................... 9

     C.    Dr. Singer's Analysis Demonstrates Classwide Injury and Can Be Used to Determine Damages for Each Class Member ............................................... 17

     D.    The District Court Correctly Found that Google's Evidence of Uninjured Class Members was Flawed and Unreliable ................................................. 19

     E.    The District Court Correctly Found that Any Focal Point Pricing Was Not an Impediment to Class Certification ............................................... 22

III.   The Petition Presents No Unsettled Question Of Law ........ 24

CONCLUSION ............................................................ 26

CERTIFICATE OF COMPLIANCE ........................................ 28

ADDENDUM ............................................................. 29

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ...............................................5, 6, 7, 24

*Comcast v. Behrend*,
569 U.S. 27 (2013) ..........................................................................18

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018).............................................................21

*In re Packaged Seafood Prod. Antitrust Litig.*,
332 F.R.D. 308 (S.D. Cal. 2019) ....................................................23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ........................................................21

*Olean Wholesale Grocery Corp. v. Bumble Bee Foods*,
31 F.4th 651 (9th Cir. 2022), *cert. denied*, ____ S. Ct. ____, 2022
WL 16909174 (Nov. 14, 2022)................................................ passim

*Story Parchment v. Paterson Parchment Paper*,
282 U.S. 555 (1931) ........................................................................18

*Waste Mgmt. Holdings v. Mowbray*,
208 F.3d 288 (1st Cir. 2000)............................................................5

*Yokoyama v. Midland Nat'l Life Ins.*,
594 F.3d 1087 (9th Cir. 2010) ........................................................18

## Rules

Federal Rules of Civil Procedure
Rule 23 ........................................................................................1, 21
Rule 23(b)(3) ...................................................................................22

Federal Rules of Evidence
Rule 702 ............................................................................................2

Rule 23(f) Advisory Committee Notes to 1998 Amendments ...................5

## RESTATEMENT OF THE ISSUES FOR REVIEW

Should this Court permit a Rule 23(f) interlocutory appeal of an order granting class certification when the district court rigorously scrutinized the proposed class's claims and committed no manifest error, and where the defendant would suffer no prejudice from presenting the class certification issues on appeal following entry of final judgment?

## SUMMARY OF THE ARGUMENT

The district court below engaged in a rigorous analysis of the proposed class's claims, including the admissibility and reliability of the proposed class's proffered expert testimony showing classwide injury and damages. In engaging in that rigorous analysis, the district court committed no error—certainly no manifest error, warranting the grant of a Rule 23(f) petition.

The district court's class certification decision presents no important, unsettled legal question. The district court merely applied the well-established standards governing class certification under Rule 23, and the equally well-established standards for determining the

1

admissibility of expert testimony under Rule 702, to the proposed class's evidence.

In its zeal to attack the district court's decision, Google mischaracterizes that decision and falsely suggests that the district court improperly flipped the burden of proof in rejecting Google's arguments. (Pet.[1] 7, 11, 14.)

Google takes out of context the district court's statement that "some attention will need to be given to fine-tune how the individualized questions on impact and damages can be managed at trial." (Add.[2] 26.) Google argues that the lower court did not identify those questions. (Pet. 7.) Google is wrong. The district court did identify those questions, describing them as "a grab bag" of "idiosyncratic factors" offered by Google that would not predominate over the common analysis of plaintiffs' economist, Dr. Hal J. Singer, especially since Dr. Singer's report made clear that his common methodology could be "customized to fit particular situations" "at an

---

[1] "Pet." references the Petition for Permission to Appeal an Order Granting Class Certification Pursuant to Rule 23(f).
[2] "Add." is the Addendum to the Pet.

app-by-app level." (Add. 20; *see* ECF 302[3] at 85:4-86:15 (Expert Proceeding Tr.) (explaining how damages can be algorithmically determined on an app-by-app basis).)

Google's argument that the district court ignored whether the class contained uninjured class members fares no better. The district court made clear that the plaintiffs submitted sufficient evidence, through their economist, "that everyone was injured because the [published rate charged by Google] was the starting point for all negotiations" and, therefore, all class members were affected. (Add. 22.)

Google's mischaracterizations of the district court's decision are so profound that it even misrepresents the size of the class's damages claims. Google asserts that the class seeks $4.7 billion in damages. (Pet. 1, 2, 5-6, 20.) Not so. That figure represents *nationwide* damages, and most of those damages are being sought by 39 state attorneys general who have brought *parens patriae* claims on behalf of their

---

[3] Unless otherwise specified, "ECF" references are to the multidistrict litigation docket, No. 3:21-md-02981-JD (N.D. Cal.). Plaintiffs attach the expert proceeding transcript (ECF 302) as an addendum to this answer because of the role it played in the district court's analysis and Google's many references to it (not always accurately) in its petition.

residents. The class consists of consumers in 17 states and territories not pursuing *parens patriae* claims.[4]

This is a strong independent reason to deny Google's Rule 23(f) petition. The district court's class certification decision in this case will not "sound the death knell of the litigation." To the contrary, the substantially identical claims of 39 state attorneys general will remain regardless, and Google will still face a trial on the same issues with the same expert testimony of injury and damages.[5] (Add. 3-4.)

Perhaps most significantly, Google resorts to significantly mischaracterizing Dr. Singer's analysis. Contrary to the false impression created by Google's petition, Dr. Singer applied well-accepted economic models, using real-world data. He also directly addressed Google's arguments about focal point pricing, which Google incorrectly says he ignored. (Pet. 2.) The district court weighed the evidence and found that Dr. Singer's analysis satisfied plaintiffs' burden

---

[4] Dr. Singer is an expert both for the class and for the state attorneys general. The class represents approximately one-quarter of Dr. Singer's nationwide damages calculation. (ECF 325-1 at 219-20 (Singer Rpt.).)
[5] The district court has made clear that it plans to conduct a single, joint trial on liability issues. The plaintiffs will be the state attorneys general, the class, Epic Games, and Match Group. The trial is expected to be held in June or July 2023. (ECF 338; ECF 392.)

of demonstrating classwide impact and damages for class certification.

At bottom, Google merely asserts that the district court's factual

findings were wrong, which does not warrant interlocutory review.

## ARGUMENT

## I. GOOGLE FAILS TO MEET THE APPLICABLE STANDARD FOR INTERLOCUTORY REVIEW UNDER RULE 23(f)

"Rule 23(f) review should be a rare occurrence." *Chamberlan v.

Ford Motor Co.*, 402 F.3d 952, 955 (9th Cir. 2005). "[M]any class

certification decisions 'present familiar and almost routine issues that

are no more worthy of immediate appeal than many other interlocutory

rulings.'" *Id.* at 959 (quoting Rule 23(f) Advisory Committee Notes to

1998 Amendments).

Rule 23(f) has two purposes, neither applicable here. One is to:

> provide[] a 'mechanism through which appellate courts, in
> the interests of fairness, can restore equilibrium when *a
> doubtful class certification ruling* would virtually compel a
> party to abandon a potentially meritorious claim or defense
> before trial.'

*Id.* at 957-58 (quoting *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288,

293 (1st Cir. 2000)) (emphasis added). As explained below, the district

court's class certification decision is not "doubtful."

The second purpose is to:

5

furnis[h] an avenue, *if the need is sufficiently acute*, whereby the court of appeals can take earlier-than-usual cognizance of *important, unsettled legal questions*, thus contributing to both the orderly progress of complex litigation and the orderly development of the law.

*Id.* (emphasis added). As discussed below, there is no important, unsettled legal question here. Google's core complaint is with the district court's fact-intensive analysis of both parties' expert analysis. (Pet. 9-20.)

Nor would interlocutory appeal contribute to the orderly progress of this complex litigation. As noted above, a joint liability trial is expected to be held just six to seven months from now. Because the claims of the state attorneys general and individual plaintiffs Epic Games and Match Group will proceed regardless of class certification, the orderly progression of the MDL would be better facilitated through the usual rule of appeal after final judgment.

This Court has articulated three non-exclusive guidelines for granting a Rule 23(f) petition, which "[o]rdinarily . . . a case warranting review . . . must come within one or more of." *Chamberlan*, 402 F.3d at 960. These are:

when: (1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous.

*Id.* at 959.

This Court further explicated when a decision is "manifestly erroneous." *Id.* The error "must be significant," the decision "inevitably will be overturned," and the error must be "easily ascertainable from the petition itself." *Id.* Further, "[t]he kind of error most likely to warrant interlocutory review will be one of law, as opposed to an incorrect application of law to facts." *Id.*

Google's petition fails to fit in any of the three categories. Google does not even claim that class certification is a "death-knell" issue, *id.* at 958, because it is not. There is no fundamental issue of law at stake here. At most, Google has attempted to manufacture such an issue by mischaracterizing the decision below as flipping the burden of proof from plaintiffs to Google, when all the district court did was address and reject Google's arguments as part of its rigorous analysis. And, as

7

discussed below, Google has made no showing that the district court committed any manifest error.

## II. THE DISTRICT COURT DID NOT COMMIT ANY MANIFEST ERROR

### A. The District Court Conducted a Rigorous Analysis

The district court carefully addressed two related motions below: consumer plaintiffs' motion for class certification and Google's motion to exclude plaintiffs' economist, Dr. Singer. (Add. 1.) In addressing these motions, the district court reviewed hundreds of pages of briefing and exhibits, including over 250 pages of expert reports from Dr. Singer and Google's economist, Dr. Michelle M. Burtis.

In addition, on July 19, 2022, the district court conducted a half-day evidentiary hearing with Drs. Singer and Burtis. (ECF 302; Add. 5.) On August 4, the district court heard attorney argument. (ECF 317; Add. 5.) Almost four months later, on November 28, the district court issued its 27-page opinion denying Google's motion to exclude Dr. Singer's testimony and granting plaintiffs' motion for class certification. (Add.; ECF 383.)

The district court's decision methodically addressed each of Google's class certification and *Daubert* arguments. The district court

8

applied the correct legal standard, relying throughout upon this Court's latest guidance in *Olean Wholesale Grocery Corp. v. Bumble Bee Foods*, 31 F.4th 651 (9th Cir. 2022), *cert. denied*, ____ S. Ct. ____, 2022 WL 16909174 (Nov. 14, 2022). (*See* Add. 7, 13-15, 20-23.) Based on this analysis, the district court concluded that "the record establishes that *plaintiffs* satisfied their burden of proof on these elements." (Add. 14 (emphasis added).)

## B. Dr. Singer Applied Well-Established Economic Models Using Real-World Evidence to Establish Common Injury and Damages

This monopolization case involves a two-sided platform, the Google Play Store, operated by Google on Android smartphones and tablets, which matches developers of apps and in-app digital content with consumers. (ECF 172 at 4-5 (2d Am. Compl.).) While developers set the price consumers pay for apps or in-app content, consumers directly pay Google for any purchase and Google takes a percentage of the price as a fee (its "take rate"), before remitting the remainder to developers. (*Id.* at 8-9.) Among other things, plaintiffs allege that Google has undertaken various anticompetitive practices to acquire and maintain its monopoly which have resulted in a supra-competitive take

9

rate causing consumers to pay more for apps and in-app digital content. (*Id.* at 5-9.)

Plaintiffs' economic expert, Dr. Singer, used the well-recognized Rochet-Tirole model for two-sided platforms to determine whether Google charged a supra-competitive take rate for app purchases through the Google Play Store. (ECF 325-1 at 113 (Singer Rpt.).) He also used the well-recognized Landes-Posner model to determine whether Google charged a supra-competitive take rate for in-app transactions between the developer and the consumer. (*Id.* at 133, 135-36.) Google did not dispute that both models are well-accepted in the field of economics, nor did it argue that they were unsuitable to calculate Google's but-for take rate as a general matter. (Add. 10-11; ECF 302 at 16:2-7, 44:19-24 (Expert Proceeding Tr.); ECF 325-5 at 393-94 (*Daubert* Mot.).)

One of many inputs to these models was the pass-through rate to consumers for costs incurred by developers, including Google's take rate. (ECF 325-1 at 115, 137-38, 141-42, 248-49 (Singer Rpt.), 252-53 (Singer Reply).) Dr. Singer could not use a regression to determine how much app prices changed when the take rate changed, because, as the

district court recognized, there was no control period clean of Google's anticompetitive conduct, and 92.4% of all paid transactions had a 30% take rate so that there was insufficient variability to undertake such an analysis. (ECF 302 at 59:15-60:4 (Expert Proceeding Tr.); ECF 325-5 at 354-57 (Singer Dep., 139:7-142:13); Add. 9.)[6]

To establish the pass-through rate, Dr. Singer used real-world data produced by Google in standard multiple regressions to determine whether a logit demand curve (as opposed to a linear or constant-elasticity demand curve) fit the data for each of the 34 different app categories used by Google. (ECF 325-1 at 145-46 (Singer Rpt.), 253 (Singer Reply); ECF 302 at 9:6-18, 41:9-19 (Expert Proceeding Tr.) (describing the inputs to each model).) Google's claim that Dr. Singer

---

[6] Google mischaracterizes a portion of this testimony as an admission that Dr. Singer "did not conduct any analysis of real-world data to test the effect of lower take rates on the prices consumers paid." (Pet. 19.) The point of Dr. Singer's testimony was that there was too little variation in Google's take rate of 30% to conduct any direct experiment of how changes in Google's take rate affected app prices. (ECF 325-5 at 354-57 (Singer Dep.), 139:7-142:13).) Therefore, a different path had to be followed, also considering real-world data, as described in the text. (Add. 9-10.)

"did not analyze pass-through using real-world data" ignores these regressions entirely. (Pet. 2.)[7]

Logit demand systems are commonly employed to calculate pass-through in antitrust analysis, including for mergers. (ECF 325-1 at 252 & n.127 (Singer Reply); ECF 302 at 60:23-61:24 (Expert Proceeding Tr.).) In a merger case, just as here, the relevant question is whether cost savings will get passed along to consumers in the form of lower prices. (*Id.* at 61:15-20.) Google's economist, Dr. Burtis, conceded that a logit demand system is frequently used in economics. (ECF 325-1 at 559 (Burtis Rpt.).)

Dr. Singer used Google's real-world data to calculate the pass-through rate in each of Google's app categories and for all categories in the aggregate. (ECF 325-1 at 148-50, Table 8 (Singer Rpt.).) Armed with empirical data showing the type of demand curve facing each developer, Dr. Singer used a standard formula for calculating the profit-

---

[7] Google suggests that there is a "legal issue" as to whether Dr. Singer's models should have "test[ed] or isolate[d] relevant independent variables," including unspecified "competitive conditions." (Pet. 15, 16, 18.) But Google ignores the significant real-world inputs to each of Dr. Singer's models discussed in the text.

maximizing pass-through rate for a developer facing such a demand curve. (*Id.* at 148-49.) Starting from the basic proposition that firms maximize profit by setting marginal revenue equal to marginal cost, the literature derives a formula from the logit demand system for how the profit-maximizing price changes as a developer's marginal costs change. (ECF 325-1 at 252-53 (Singer Reply), 148-49 & n.516 (Singer Rpt.).)

While Google derides what it calls the "one minus share" formula as seemingly too simple (Pet. 16, 18), it is derived from a much more complex equation through a multi-step calculation in a peer-reviewed article. (ECF 302 at 97:15-100:6 (Expert Proceeding Tr.).) It measures how an increase in developers' marginal costs (from Google's overcharge) affects consumer prices and yields the economically intuitive result that developers with less pricing power will pass through to consumers a larger proportion of a given cost decrease.[8] (*Id.* at 98:16-100:13; ECF 325-1 at 252-53 (Singer Reply).) Contrary to Google's argument (Pet. 7, 16, 18), the formula is academically

---

[8] Below Google challenged whether this formula included marginal costs and covered an *ad valorem* take rate. The district court rejected both arguments (Add. 11, 18-19), and the Petition does not directly challenge either determination.

13

supported and has been used in a similar fashion in antitrust merger cases to determine by how much consumer prices will change as the result of cost savings, the same question at issue in this case. (ECF 325-1 at 145 n.507, 148-49 & n.516 (Singer Rpt.), 251-52 & n.127, 256-57 & nn.150-52 (Singer Reply); ECF 302 at 60:23-61:24, 62:13-64:2 (Expert Proceeding Tr.).) Google's expert, Dr. Burtis, had to agree that the formula was derived in an academic article. (ECF 302 at 57:19-23 (Expert Proceeding Tr.).)

Nor does the model simply "assume[] that developers always pass on cost savings in proportion to 'market share'" as Google claims. (Pet. 7.) Rather, the regressions Dr. Singer performed and the multi-step calculation to derive the logit pass-through formula *confirms* that profit-maximizing developers in the relevant markets studied by Dr. Singer will pass along a change in marginal cost in that manner.[9]

---

[9] Google's argument that "Dr. Singer admitted that his model accounts for only one factor: 'the implied pass-through rate' given an app's market share in its category" once again mischaracterizes Dr. Singer's testimony. (Pet. 16 (citing ECF 325-5 at 241 (Singer Dep.)).) Dr. Singer testified that the *output* of his methodology gives that "implied pass-through rate," but in answer to the next question, he explained that his regressions "control[] for any of these attributes of the app that are constant over time." *Id.* at 241-42.

In rejecting Google's arguments on this score (Add. 10-11, 19-20), the district court did not commit an error of law or "flip" the burden of proof. Just as courts do every day, the district court simply found that Dr. Singer's model satisfied Plaintiffs' burden and that Google's arguments to the contrary were unpersuasive. (Add. 14.)

Google also nonsensically challenges Dr. Singer's use of its own 34 app categories. (Pet. 17.) Those categories are used by industry analysts and are similar to Apple's categories. (ECF 325-1 at 254-56, Table 2 (Singer Reply).) The district court gave Google's argument the weight it deserved. (App. 19-20 ("Google made the point mainly as an observation, rather than a well-formulated analysis . . .").)

Google also suggests that Dr. Singer's analysis assumes that every app in every category "must be in perfect competition" and that "Dr. Singer agreed" that assumption was inaccurate. (Pet. 3, 17.) But that is a mischaracterization of Dr. Singer's testimony.[10] Dr. Singer cited

---

[10] The question by Google's attorney was: "In a logit model, all of the goods in the market being studied have to be substitutes in proportion to their shares of that market; isn't that correct?" (ECF 302 at 116:9-11 (Expert Proceeding Tr.).) Dr. Singer answered that the characterization was "fair" because he had just testified that the goods in a logit demand system needed to be substitutes only "to some extent," and he then testified in answer to the next question that the goods did not have to

well-established economic authority that the logit demand system does not require perfect substitution—it allows product differentiation. (ECF 325-5 at 500 (*Daubert* Opp.) (citing ECF 325-1 at 256-57 (Singer Reply)).)  The regressions Dr. Singer ran for each of the app categories—ignored by Google in its petition—show the logit model has "a very tight fit" to the data, reflecting "the fact that all of these apps within the category are substitutes in some way." (ECF 302 at 81:18-82:22 (Expert Proceeding Tr.).)  The regressions showed that when prices rose for an app within a category, consumer demand shifted to other apps in that category following the pattern predicted by the logit model.  (ECF 325-1 at 145-46 (Singer Rpt.).)  Because the models Dr. Singer used allow for differences in degree of substitutability, and his regressions confirmed that substitutability, Google's cherry-picked examples were no barrier to its applicability.  (ECF 302 at 117:2-22 (Expert Proceeding Tr.).)  Considering these facts, the district court's rejection of Google's arguments that Dr. Singer should not have used

---

be "substitutes in perfect proportion to their share," and his regression analysis demonstrated that there was sufficient substitutability to find a logit demand system applied here.  (*Id*. at 116:5-24.)

Google's own app categories and that all apps in each category had to be perfect substitutes (Add. 19) was not in error, let alone "manifest error."

## C. Dr. Singer's Analysis Demonstrates Classwide Injury and Can Be Used to Determine Damages for Each Class Member

In his Rochet-Tirole and Landes-Posner models, Dr. Singer used his calculated pass-through rate as well as other Google data to find that for paid apps the competitive take rate would be 23.4% rather than 30.1% and for in-app content the competitive take rate would be 14.8% rather than 29.2%. (ECF 325-1 at 121-22, 135-38 (Singer Rpt.).) Dr. Singer then calculated the aggregate damages from these differences and described how each consumer's damages could be calculated by a common formula using her purchases by app category, the difference between the competitive and but-for take rates, and the pass-through rate for the app category. (*Id.* at 169-71.) Contrary to Google's claim (Pet. 16), the results of these calculations can be used at trial to demonstrate injury and damages for each individual class member.[11]

---

[11] Google constructs a straw man that plaintiffs were required to show that at least one developer from whom each consumer bought a product would have lowered its price. Pet. 2, 9. There is no such requirement in law or based on the facts of this case. And in any event, Dr. Singer confirmed that his methodology can be mechanically applied on an app-

*See Olean* at 668-69 ("we have held that a district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial, a conclusion implicitly based on the determination that such individualized issues do not predominate over common ones").  Indeed, it is well-recognized that there is a relaxed standard of proof for damages in antitrust cases.  *See Comcast v. Behrend*, 569 U.S. 27, 35 (2013) (damage "[c]alculations need not be exact"), citing *Story Parchment v. Paterson Parchment Paper*, 282 U.S. 555, 563 (1931) ("it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate").

The district court did not manifestly err in rejecting Google's argument "that plaintiffs lack[ed] a common method of calculating class-wide damages 'for the same reasons they lack[ed] common proof of impact.'"  (Add. 23.)  Nor did the district court err by quoting this Court's prior decision in *Yokoyama v. Midland Nat'l Life Ins.*, 594 F.3d 1087, 1094 (9th Cir. 2010), that individualized "damage calculations

---

by-app and consumer-by-consumer basis.  (ECF 302 at 86:10-15 (Expert Proceeding Tr.).)

*alone* cannot defeat [class] certification." (Add. 23 (emphasis added);

*compare* Pet. 3-4 (mischaracterizing the decision below as "conclud[ing]

that individualized issues with respect to damages *can never prevent*

class certification" (emphasis added).) There is no "recurring and hotly

debated question" here. (Pet. 21-23.)

**D.  The District Court Correctly Found that Google's Evidence of Uninjured Class Members was Flawed and Unreliable**

Google argues that there was "significant" evidence that the "vast

majority" of class members were uninjured. (Pet. 5, 7, 9-10.) That

claim depends entirely on the analysis of its own expert, Dr. Burtis, of

the effect of certain limited take rate reductions on the prices

developers charged consumers. (Pet. 9.)[12] However, Dr. Burtis's

analyses of the effect of Google's reductions in take rates were shown to

be flawed and unreliable.

Dr. Burtis's analyses were based on what she called SKUs. (ECF

325-1 at 514 (Burtis Rpt.).) However, by relying on SKUs, Dr. Burtis's

---

[12] For instance, when Google says that "[e]vidence confirms that when Google changes its service fees, the vast majority of developers do not reduce prices," (Pet. 5), the only evidence it cites (and the only evidence it can cite) is Dr. Burtis's expert report.

analysis missed every change in price when a developer lowered a price on an app by giving it a different SKU. (ECF 302 at 72:4-74:9 (Expert Proceeding Tr.).) So she undercounts the actual products with changes in price due to a take rate change. That error was "endemic to her analysis." (*Id.* at 74:8-9.)

Dr. Burtis's time frames were also too short to see an adjustment in prices, particularly when prices are sticky as they are here. (*Id.* at 68:6-69:18; ECF 325-1 at 266, 269 (Singer Reply), 142-43 (Singer Rpt.).) She only compared prices in the 30 days before and after a take rate change and in the six months before and after a take rate change. (ECF 325-1 at 515, 554 (Burtis Rpt.), *and see id.* at 639, 653 (Exhibits 36, 50).)

Her only longer-term analyses were entirely botched, as Google provided no mechanism for developers to lower their prices in that instance. In 2018, Google lowered its take rate for subscriptions that were in their second year. Dr. Burtis analyzed whether developers changed prices for those second-year subscriptions. (*Id.* at 514 & n.193.) However, Google did not permit developers to change a price in the second year without also altering their prices in the first year (when

20

Google was still charging those developers the higher take rate) making pass-through of the second-year take rate reduction impossible. (ECF 302 at 64:25-65:20 (Expert Proceeding Tr.).) Unsurprisingly, Dr. Burtis found very few products with changes in prices.

Thus, the district court rightly concluded that Dr. Singer had "raised several serious questions about Dr. Burtis's analysis," so that the analysis was "of minimal value." (Add. 21.) Accordingly, there was insufficient evidence that there were any uninjured class members, much less a "vast majority" of uninjured class members affected by Google's anti-competitive conduct. (*Id*.) The district court did not "flip" the burden of proof from plaintiffs to Google in rejecting Dr. Burtis's flawed analysis purportedly finding (although not identifying) uninjured class members. (Pet. 7, 11, 14; *see also Olean*, 31 F.4th at 680.)

Consistent with the district court's analysis here (Add. 21), this Court *en banc* in *Olean*, 31 F.4th, at 669, rejected as a matter of law arguments like Google's regarding uninjured class members:

> [W]e reject the dissent's argument [citing *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019), and *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018), also relied on by Google here (Pet. 11)] that Rule 23

21

does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members. . . .  This position is inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages. See Fed. R. Civ. P. 23(b)(3).

There is no ground on which to grant Google's petition based on unproven and unknown uninjured class members.

### E.   The District Court Correctly Found that Any Focal Point Pricing Was Not an Impediment to Class Certification

Google argues that nearly all developers price their apps to end in 99 cents, for which focal point pricing Dr. Singer purportedly did not account.  (Pet. 2, 10, 18.)[13]  However, Dr. Singer pointed out that at least 130,869,000 U.S. app and in-app transactions, according to Google's data, were at prices that did not end in 99.  (ECF 325-1 at 237 (Singer Reply).)  Indeed, "supermarket pricing," that is, prices ending in

---

[13] Google argues that Dr. Singer admitted that his model did not account at all for focal pricing.  (Pet. 18.)  However, what Dr. Singer actually said was: "I don't think . . . that particular logit estimate of the 89 percent [pass-through rate] is accounting or needs to take account [of focal point pricing]. I think *I need to account for it in my overall opinions about what the but-for world would look like.*"  (ECF 325-5 at 240-41 (Singer Dep., 205-06) (emphasis added).)

9 cents (as opposed to Google's claim that focal point pricing would manifest in 99 cents) is already observed in the Google Play Store. (*Id.* at 238-39, Fig. 3.)

Further, one of Google's restraints that would be eliminated in the but-for world is Google's prohibition on developers steering consumers to app stores other than the Google Play Store where the developers' revenue might be higher due to a lower take rate even if the price to consumers were lower. Google's speculation that developers would forego such profit maximization by charging a price other than one ending in 99 when steering was permitted makes no economic sense. (*Id.* at 237.) Therefore, the district court did not commit a manifest error in rejecting focal point pricing as one of a "grab bag" of idiosyncratic factors would not result in any individualized issues predominating over the common methodology presented by Dr. Singer. (Add. 20; *accord In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 343 (S.D. Cal. 2019)) (rejecting focal point pricing challenge to class certification because the expert "in fact discusses both in his report", *aff'd on reh'g en banc sub nom. Olean*, 31 F.4th 651.)

## III. THE PETITION PRESENTS NO UNSETTLED QUESTION OF LAW

Google has identified no unsettled question of law warranting review. "The kind of error most likely to warrant interlocutory review will be one of law, as opposed to an incorrect application of law to facts." *Chamberlan*, 402 F.3d at 959. While Google attempts to frame its statement of the issues for review as pure questions of law, its real complaints—which are meritless as discussed *supra* at Part II—are with the district court's application of the facts to the law.

First, Google asks whether "a district court [must] conduct a rigorous analysis of the extent to which the proposed class contains uninjured class members before it can certify the class." (Pet. 1.) But as explained above, the district court considered and rejected Google's only evidence that uninjured class members were present. Even if this case did present that question of law, this Court analyzed a similar question *en banc* just this year in *Olean*, 31 F.4th at 669, and the district court followed that opinion's analysis. (Add. 7, 13-15, 20-23.)

Second, Google asks, "Can a district court certify a class based on an injury model that does not account for variables that yield individualized differences among class members?" (Pet. 1.) But the

24

district court did no such thing.  Google frames this question by claiming Dr. Singer "borrowed a model from a different economic context that involves just *one* variable: market share."  (*Id.* at 7.)  But as discussed above, that claim ignores all but one step in Dr. Singer's analysis and the use of the logit demand system analogously in merger cases.  As the district court recognized, Dr. Singer relied on numerous regressions and well-accepted economic models, all of which consider and control for many variables.  (*Supra* Part II.B.)  Google never specifies which "competitive conditions" Dr. Singer's work disregarded (Pet. 16), because doing so would require it to engage with the work Dr. Singer actually performed.

Third, Google asks whether a district court must "actually analyze whether individualized issues with respect to damages calculations predominate."  (Pet. 1.)  As explained above, the district court made that analysis as part of its discussion of antitrust impact, which Google's petition ignores.  (*Supra* Part I.F; Add. 23 ("Plaintiffs have prevailed on that issue [common proof of impact], and Google's damages attacks are overruled on the same grounds."); *see also Olean*, 31 F.4th at 669 ("Rule 23(b)(3) . . . requires only that the district court

determine . . . whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages").)  Since the Court analyzed those issues, Google's proposed question is not presented by this case.

Each of Google's attempts to frame a common legal question ignores the actual factual analysis the Court conducted or misrepresents the expert analysis of Dr. Singer.  Such fact-bound conclusions, which are not manifestly erroneous, do not warrant Rule 23(f) review.

## CONCLUSION

For the foregoing reasons, Google's Rule 23(f) petition should be denied.

Date: December 19, 2022          By:  /s/ *Hae Sung Nam*

Hae Sung Nam
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue
New York, NY  10022
Telephone: (212) 687-1980
Facsimile:  (212) 687-7715
hnam@kaplanfox.com

Karma M. Giulianelli
BARTLIT BECK LLP
1801 Wewatta St., Suite 1200
Denver, CO  80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140
karma.giulianelli@bartletbeck.com

Attorneys for
Plaintiffs-Respondents

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 5(c)(1) and Ninth Circuit Rules 5-2(b) and 32-3 because it contains 5,172 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 5(1)(b)(E) and 32(f).

2.     This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it was prepared in Microsoft Office Word 2010 in 14-point Century Schoolbook, a proportionally spaced typeface.


DATED: December 19, 2022          /s/ *Hae Sung Nam*
                                  Hae Sung Nam

                                  Attorney for
                                  Plaintiffs-Respondents

**ADDENDUM**

**Pages 1 - 121**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
IN RE GOOGLE PLAY STORE        )
ANTITRUST LITIGATION           )   NO. 21-md-02981 JD
_____)
```

San Francisco, California
Tuesday, July 19, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Epic Games:
     CRAVATH SWAINE AND MOORE LLP
     825 Eighth Avenue
     New York, New York 10019
  BY: **LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**

     FAEGRE DRINKER BIDDLE & REATH LLP
     Four Embarcadero Center
     27th Floor
     San Francisco, California 94111
  BY: **PAUL J. RIEHLE, ATTORNEY AT LAW**

For the Consumer Class Plaintiffs:
     KAPLAN FOX AND KILSHEIMER LLP
     850 Third Avenue
     14th Floor
     New York, New York 10022
  BY: **HAE SUNG NAM, ATTORNEY AT LAW**
     **GREGORY K. ARENSON, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
      CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For the Consumer Class Plaintiffs:
                         BARTLIT BECK LLP
                         1801 Wewatta Street
                         Suite 1200
                         Denver, Colorado 80202
               BY:   **KARMA M. GIULIANELLI, ATTORNEY AT LAW**

                         BARTLIT BECK LLP
                         54 West Hubbard Street
                         Suite 300
                         Chicago, Illinois 60654
               BY:   **LEE M. MASON, ATTORNEY AT LAW**


For Plaintiff Brian McNamara:
                         COTCHETT, PITRE & MCCARTHY LLP
                         San Francisco Airport Office Center
                         840 Malcolm Road
                         Burlingame, California 94010
               BY:   **JAMES G.B. DALLAL, ATTORNEY AT LAW**


For State of California:
                         OFFICE OF THE ATTORNEY GENERAL
                             OF CALIFORNIA
                         California Department of Justice
                         455 Golden Gate Avenue
                         Suite 11000
                         San Francisco, California 94102
               BY:   **PAULA L. BLIZZARD, ATTORNEY AT LAW**


For State of Utah:
                         OFFICE OF THE UTAH ATTORNEY GENERAL
                         160 East 300 South
                         Fifth Floor
                         Salt Lake City, Utah 84114
               BY:   **BRENDAN P. GLACKIN, ATTORNEY AT LAW**
                     **LAUREN M. WEINSTEIN, ATTORNEY AT LAW**


               **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendants:
                              MORGAN LEWIS & BOCKIUS LLP
 3                            One Market Street
                              Spear Street Tower
 4                            San Francisco, California 94105
                    BY:   BRIAN C. ROCCA, ATTORNEY AT LAW
 5                        SUJAL SHAH, ATTORNEY AT LAW

 6                            MUNGER, TOLLES & OLSON LLP
                              560 Mission Street, 27th Floor
 7                            San Francisco, California 94105
                    BY:   JUSTIN P.  RAPHAEL, ATTORNEY AT LAW
 8
                              MUNGER TOLLES & OLSON LLP
 9                            350 South Grand Avenue
                              Fiftieth Floor
10                            Los Angeles, California 90071
                    BY:   GLENN D. POMERANTZ, ATTORNEY AT LAW
11

12   Also Present:          Michelle M. Burtis, Ph.D.
                            Hal J. Singer, Ph.D.
13                          Nathan Hatch

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:21-cv-04029-JD Document 66 Filed 07/23/22 Page 4 of 122

 1   <u>**Tuesday - July 19, 2022**</u>                                    <u>**2:00 p.m.**</u>

 2                              **P R O C E E D I N G S**

 3                                 ---o0o---

 4        **THE CLERK:**  Now calling Civil Case 21-md-2981, In Re

 5   Google Play Store Antitrust Litigation.

 6        **THE COURT:**  Okay.  Welcome.  Let's see.  Who do we have?

 7   Who's here?

 8        **DR. BURTIS:**  Hi, Your Honor.  I'm Michelle Burtis.

 9        **THE COURT:**  Dr. Burtis.

10        **DR. BURTIS:**  Yes.

11        **THE COURT:**  Okay.  And who is this?

12        **MR. HATCH:**  My name is Nathan Hatch.  Nathan Hatch. I'm

13   helping with the slides.

14        **THE COURT:**  All right.  And you're with Dr. Burtis?

15        **MR. HATCH:**  Yes.

16        **THE COURT:**  You're not an attorney?

17        **MR. HATCH:**  No.

18        **THE COURT:**  Okay.  Oh, if you're fully vaccinated and

19   you're comfortable, you can remove your masks.  It's totally up

20   to you, but you're certainly welcome to do that.

21        And for plaintiffs?

22        **DR. SINGER:**  Your Honor, Hal Singer.

23        **THE COURT:**  We have to use the mics.

24        **DR. SINGER:**  Hal Singer, Your Honor, for plaintiffs.

25        **MR. DALLAL:**  And, Your Honor, my name is James Dallal.  I

1  am an attorney, but we do not have any non-attorney members in

2  our team.  So my role in this proceeding will be limited to the

3  slides.

4  **THE COURT:**  You're just handling the slides.

5  Okay.  All right.  Well, I'm here for one of my favorite

6  types of hearings.  So here is our format.  We're going to

7  swear you in.  And we'll begin with plaintiffs.  I have the

8  list of topics that you two negotiated in descending order of

9  criticality, importance; right?  Okay.  And I'm going to set

10 the stage with a question of my own that I want both of you to

11 focus on as you go through this.

12 And then, at the end of it, I'll ask if there are any

13 lawyers who have questions.  You can come up and make an

14 appearance and ask your questions.  Whether I let you ask the

15 questions or not, we'll see; but I'll certainly let you pose

16 the question.

17 Okay.  Let's begin.  So you can stay seated, or you can

18 stand at the podium, either way.  But just have a microphone in

19 front of you.  Otherwise, we won't be able to hear you.  Okay?

20 All right.  Bhavna, would you swear in the economists.

21 **THE CLERK:**  Yes.

22 Please raise your right hand.

23 (Dr. Burtis and Dr. Singer placed under oath.)

24 **DR. BURTIS:**  I do.

25 **DR. SINGER:**  I do.

1      **THE CLERK:**  Thank you.

2      **THE COURT:**  All right.  So we'll go down the topics in

3  Exhibit 1, starting with that first topic, which is

4  "Dr. Singer's Estimates of Google's But-For Service Fee Rates."

5      Here is what I would like you to focus on as we have our

6  discussion.  I would like to understand the method and the

7  techniques that the plaintiffs are going to use to establish

8  that there is some uniform way of determining that, but for the

9  challenged conduct, Google would have had lower service fees to

10  the developers.  That's Part 1.

11      And Part 2 is the same premise with respect to the but-for

12  conduct; that there is some uniform way of establishing that

13  consumers would have paid less for apps.  That is what I'm most

14  interested in.

15      Now, remember that the point here is to determine the

16  reliability and confidence of the methods that are going to be

17  used by the economists.  I'm most interested in hearing about,

18  for example, anything that the defendants think Dr. Singer is

19  doing that is well beyond the purview of what an economist

20  would normally do, and Dr. Singer's response to that.  The more

21  cross-examination points, "Well, Dr. Singer didn't take into

22  account certain factors, X, Y, and Z," I'm not interested in.

23  All right?  This is about reliability, acceptance, the ability

24  to replicate results, the soundness of the technique.  That is

25  what our focus is on.  Okay?

1        All right.  So, Dr. Singer, you are on plaintiff side.

2   Why don't you begin.  Topic 1.

3        **DR. SINGER:**  Thank you so much.  And good afternoon,

4   Your Honor.  It's very nice to see you again.

5        **THE COURT:**  By the way, you two can -- this is meant to be

6   an interactive exchange.  So you can pose questions to each

7   other, not interrupting, but certainly during your

8   presentations.  And if I don't like the question, I'll just ask

9   you to move on, but you can certainly ask.  Okay?  It's meant

10  to be more of a conversation.  All right?  That's the hot tub

11  aspect.

12       **DR. SINGER:**  Sure.

13       **THE COURT:**  You don't deliver monologues in a hot tub.

14  You interact.

15                      (Laughter.)

16       **THE COURT:**  At least the hot tubs that you want to be in.

17  Okay.

18       **DR. SINGER:**  So the first topic, Your Honor, is my

19  estimation of the but-for take rates.  I like to call them the

20  take rates.  I think Google calls them the service rates.

21  Hopefully, we can still be friends.

22       I used two different models to model the but-for take

23  rates.  I have one model for the app distribution market, and I

24  have a separate model for the in-app aftermarket support

25  services.  And if it's okay with you, I'd like to present each

Case 3:21-cv-05227-JD Document 407 Filed 04/23/22 Page 40 of 155

 1  one separately in succession, just so that we don't get

 2  confused.  They're separate markets, separate models.  Is that

 3  okay, Your Honor?

 4       **THE COURT:**  That's fine.

 5       **DR. SINGER:**  Okay.  Thank you so much.

 6       So if we start with the app distribution market, I only

 7  have three points here.

 8       The first point is, the Rochet-Tirole model is generally

 9  accepted and fits the facts of this case.

10       Can I see Slide 1, please?

11       You'll see on Slide 1 a two-sided market here.  Now, we

12  need a two-sided platform model to capture the two-sided nature

13  of the Android app distribution market.  Google is centered in

14  this figure, you can see, and Google is the matchmaker.

15  They're bringing together consumers on one side of the market

16  and app developers on the other side of the market.  And

17  they're taking advantage of this wonderful thing called

18  indirect network effects, which is what makes this a two-sided

19  market.

20       Indirect network effects means that as more developers

21  come to the platform, the consumers on the other side of the

22  market derive greater value for being members or on the

23  platform and vice versa.  As more consumers come to the

24  market -- come to the platform, the developers find the

25  platform more valuable.  Hence, the name "indirect network

1    effects." Okay?

2        And the good news here is that a Nobel Prize winner,

3    Jean Tirole, and his co-author, Jean-Charles Rochet, created

4    the foundational model of pricing in a two-sided market, and

5    that's the model that I used to estimate the but-for take rate.

6        Point Number 2, the Rochet-Tirole model employs real-world

7    data for this case.

8        Can I see Slide 2, please?

9        This is going to show you all of the inputs that informed

10   the Rochet-Tirole model. Now, I'm not going to take you

11   through them all, Your Honor. But I would like to point out

12   that once we have the right model, what we have to do is

13   provide inputs to the model. And this is where we get into the

14   dispute. Okay?

15       Now, I use real-world data. Just to give an example,

16   Google's marginal cost was a key input. It comes from their

17   financial data. I need prices on both sides of the market.

18   That was calculated from Google's transactional data.

19       Pass-through is an input. And there is a dispute over

20   the -- on the pass-through for sure; but I'd like to table that

21   one, because we're going to have an entire debate on

22   pass-through, and focus on what I think is the remaining issue

23   for this model.

24       Now, for this pass, I use the Rochet-Tirole model to

25   estimate a but-for take rate -- that is, the price that's

1    charged to the developers in a but-for world absent the

2    challenged conduct -- holding the subsidy to consumers on the

3    other side of the market constant.

4         And another pass -- and we're going to debate this too;

5    it's called the play points model -- I do the opposite.  I

6    solve for the but-for subsidy in the advent of more

7    competition, holding constant the take rate.

8         And then I do a third one called the hybrid.  We're not

9    going to debate that one today, but just so that you know, I've

10   done that one as well.

11        And my third and final point for this section -- then I

12   can pass the baton over to Dr. Burtis -- is that other than

13   suggesting that it can't be used marketwide, Dr. Burtis largely

14   gives the Rochet-Tirole model a pass.  She doesn't dispute that

15   the Rochet-Tirole model is standard.  She doesn't dispute that

16   it's widely accepted in the literature.  She lodges two primary

17   attacks.  The first is that it can't be estimated on a

18   marketwide basis, and the second is she has the problem with

19   the pass-through.

20        **THE COURT:**  If I could, so the Rochet-Tirole model is

21   going to yield one number for everyone?

22        **DR. SINGER:**  Yes.

23        **THE COURT:**  A percentage for everyone?

24        **DR. SINGER:**  What it's going to yield on this go-through,

25   Your Honor, is a but-for headline take rate.  And the reason

why I'm going to use it to generate a but-for headline take
rate, a singular but-for headline take rate is because Google
uses a singular headline take rate in the actual world.  That's
the 30 percent number.

Now, it's true that Google occasionally will negotiate --

**THE COURT:**  They use it for what?  For --

**DR. SINGER:**  They use it as the starting place for every
developer's price to join the platform.  It is true --

**THE COURT:**  In other words, that's the list price, so to
speak?

**DR. SINGER:**  That's a nice way of putting it.  In a
pharmaceutical case, it might be called the rack price; but
here, I consider it as the headline rate.

And what Google does, Your Honor, is they selectively
enter into discounts off the headline rate.  But all
negotiations begin with the headline rate, and importantly,
none of the negotiations are done on an individual basis.  None
of them.

When Google makes an exception to the but-for headline
take rate, as it did -- for example, Your Honor, you'll
remember in 2018, Google cut the second year -- the
subscription -- sorry -- the take rate for subscription
products in Year 2 from 30 to 15 percent.  That applied to
every developer who had a subscription product.  That was not
negotiated on an individualized basis.  Anybody who had a

1    subscription product was entitled to the 15 percent.
2    All right?

3        So that's the Reason Number 1 that this model should be
4    applied on a marketwide basis, because I want to mimic what
5    Google does, how it constructs its pricing, just as it does in
6    the actual world, absent the challenged conduct.

7        Dr. Burtis would have you believe that in the but-for
8    world, Google would enter into hundreds, if not thousands, of
9    individualized negotiations with each app developer.  And I ask
10   you, if they're not doing that today, why would they do that in
11   the but-for world in the absence of the challenged conduct?
12   The business model is going to stay the same.

13       And there's one other reason, Your Honor, and then I'll
14   turn over the baton; and that is -- for using it on a
15   marketwide basis; and that is, Google is offering the same
16   basic service to all developers.  Right?  It is a matchmaker.
17   "Come to our platform and we'll provide you a boatload of
18   users."  These aren't individualized or differentiated products
19   that Google's offering.  By and large, everyone who comes gets
20   the same service.

21       So for those two reasons, Your Honor -- we're mimicking
22   what Google does in the actual world and it's the same basic
23   product -- for those two reasons, it makes sense to have a
24   model that delivers a singular but-for headline rate.  The
25   Rochet-Tirole model is the best model in the literature that

1  can do that, and that's exactly what I used it for.

2      THE COURT:  And what is that number?

3      DR. SINGER:  The but-for take rate -- well, in the --

4  going by memory, it's around 15 percent in the but-for world.

5  It's 30 percent today.  I go to 15 percent.

6      And importantly, any developer who is able to negotiate --

7  not individually, but within its group.  Whatever developer was

8  able to secure a lower discount rate, a discount off that

9  30 percent, I applied the same discount in proportional terms

10  that they achieved in the actual world into the but-for world.

11      THE COURT:  Let me ask you this:  Do you know how many

12  developers got special deals off the list price?

13      DR. SINGER:  Very small number.  I can tell you that there

14  was one program called LRAP, the Living Room Accelerator

15  Program, Your Honor, LRAP, and I believe about 50 of the

16  largest developers got deals.  But, again, everyone got the

17  same deal.  It was not individually negotiated.  And these

18  developers, I think, accounted for one-tenth of 1 percent of

19  the developers in the database.

20      THE COURT:  All right.  Dr. Burtis, what's wrong with

21  that?

22      DR. BURTIS:  Well --

23      THE COURT:  Do you have any objection to the R-T model?

24      DR. BURTIS:  So let me say just a few things.

25      THE COURT:  A little closer to the mic.

 1        DR. BURTIS:  How that's?  Better?

 2        THE COURT:  Slightly.  Can you pull it a little closer to

 3   you?  Good.  Okay.

 4        DR. BURTIS:  How's that?

 5        THE COURT:  That's better.

 6        DR. BURTIS:  Okay.  Okay.  So, Your Honor, a few things

 7   about these various models.  First, I wasn't asked to evaluate

 8   whether or not these models were the right models for merits,

 9   and so I'm not going to talk to you about that.  The only issue

10   for me is whether these models can analyze the issue of whether

11   or not all of the but-for service fee rates would be lower.

12        And so I wanted -- and let me just say something about

13   these models, because Dr. Singer -- I think he still has his

14   slide up here for Table 3.  This is essentially the model.  So

15   this is not like -- you might be, you know, used to econometric

16   models, for example, where you estimate an overcharge.  What

17   these models are, it's like a list of equations; and

18   Dr. Singer, you know, inserts or inputs particular numbers into

19   the equations and then solves them for a single number.

20        And so the point that I'm going to make here is that all

21   of those inputs -- and you can look at Table 3 or Table 5.

22   He's got a couple of slides -- every one of those inputs is

23   either an aggregate, like total consumer expenditure in

24   Google Play, or it's an average.

25        Like, for example, in -- it's not up anymore.  In Table 3,

1    I believe the average price for all apps he has in there is

2    $3.99.  And in his model for IAPs -- that's the in-app

3    purchases -- which is a separate model, the average price is

4    $8.99.  Even though there's tremendous variation in those

5    prices, it's just a single number.

6        Every one of those numbers in these models are like that.

7    They're either an aggregate or an average.

8        So a couple of things.  One is that Dr. Singer said there

9    was absolutely no individualized negotiations.  That's not

10   actually true.

11       **THE COURT:**  Let me just -- I may have missed your answer,

12   but as a concept, though, the Rochet-Tirole approach is sound

13   in this market, if you assume it's a two-sided platform market;

14   right?

15       **DR. BURTIS:**  So as I said, you know, I don't want, as an

16   expert who's here for Google, to say that this is the right

17   model for --

18       **THE COURT:**  I'm not saying -- no, that's not the issue.

19   The issue is --

20       **DR. BURTIS:**  Okay.

21       **THE COURT:**  -- is this so far off the charts that --

22       **DR. BURTIS:**  Oh, no.

23       **THE COURT:**  -- no reasonable economist would ever use a

24   Rochet-Tirole model to analyze -- you may not agree with the

25   output or the inputs, but just the model selection itself,

1    you're okay with that?

2        **DR. BURTIS:**  You know, it is used in economic literature,

3    Your Honor.  It is.

4        **THE COURT:**  Okay.

5        **DR. BURTIS:**  It is, of course, not used to analyze common

6    impact.  But it is used in the way that Dr. Singer is using it

7    here, which is kind of an average or overall effect, because

8    the model is -- it does produce a single answer and it does

9    produce either impact for everybody or no impact for everybody.

10   It's just -- you know, it's a one-for-all or all-for-one kind

11   of result.

12       And let me say, the other thing about the model is that it

13   turns on Dr. Singer's assumption about what will happen to

14   Google's market share in the but-for world.  That's very key in

15   these models.

16       And so one thing that happens in these models is, like, if

17   you reduce their market share for, like, 1 percent or

18   2 percent, just a little bit, what you're going to get is a

19   reduction in the service fee rate for everybody.  And that is

20   not the way that competition in this market has worked.  Right?

21       What we see -- and I talk about this in my report when I

22   talk about the characteristics of this business -- developers

23   and apps are very different from one another.  And there are

24   some developers with really popular apps, and they have the

25   ability to move consumers from one store to another.  And so

1  Google will focus on those developers and they will offer those

2  developers deals.  And, in fact, they have individually

3  negotiated deals with certain developers.  And I talk about

4  this in my report.  And in my report, in Exhibit 8, there's,

5  like, a list of all of these developers who got these special

6  deals.

7      So the model is fine for what it is, for the way that it

8  is used in the literature, but it's not addressing the issue of

9  common impact.  Right?  It's assuming --

10     **THE COURT:**  Well, Dr. Singer says that Google's business

11 practice, what it does every day with developers is to start

12 with the list price, the rack rate of 30 percent.

13     Do you disagree with that?

14     **DR. BURTIS:**  I think that's an assumption on his part.

15     What Google has done is offered different rates.  It has

16 offered 15 percent to --

17     **THE COURT:**  Well, that may be; but the starting point, the

18 baseline is 30 percent.  You walk in the door at the

19 Play Store; 30 percent is on the table.  Then you may have the

20 consumer demand to negotiate a sweeter deal for yourself if

21 you're a developer.

22     But do you disagree -- and, if so, you need to tell me

23 why.  Do you disagree with the proposition that the list rate,

24 the rack rate, is 30 percent for everybody?  That's the

25 starting point, at least, for everybody in the Play Store.

 1      **DR. BURTIS:**  So I guess I do disagree.  I mean, it's -- it

 2  is unclear how -- why we can just assume that a rate of

 3  15 percent is a discount off of 30.  I mean, it's 15 percent.

 4  And I don't know -- I mean, there's no reason that you have to

 5  say that it's a discount off of 30.  It is what it is.

 6      And just to go back to the deal -- to the developers who

 7  are negotiating these deals with Google, they are negotiating

 8  for services.  And each of these deals are customized to the

 9  individual developer.  They are heavily negotiated for

10  sometimes months, and it is the value of those services that

11  are being negotiated.

12      **THE COURT:**  Okay.

13      **DR. BURTIS:**  And so I do want to just make one last point

14  about this model because -- and I think Dr. Singer and I agree.

15  The fundamental dispute between us or the primary dispute

16  between us is on the pass-through rate.

17      And just to focus you on that, you can see in this slide

18  the pass-through rate is 89.9 percent in both the actual world

19  and the but-for world.  And that, too, is an average,

20  Your Honor.  And it is used throughout Dr. Singer's models.

21      **THE COURT:**  Well, let me ask you this:  How many

22  developers did not pay 30 percent as a percentage?

23      **DR. BURTIS:**  I don't know if I have that number.

24      So in Exhibit 8, what I have is a list of developers who

25  are -- who are getting these deals, the special deals.

1    In addition to those, any developer who has subscriptions,

2    they will get a lower rate on every subscription that is more

3    than a year old.  And right now, I don't know exact- -- I don't

4    know that I have that number in my report, like how many

5    developers there are.

6    **THE COURT:**  Well, I mean, is it your understanding that

7    most developers pay the 30 percent and some get a discount, or

8    is it vice versa?

9    **DR. BURTIS:**  Oh, no.  Most -- more than most pay

10   30 percent, Your Honor, because, again, the idea or the feature

11   of this marketplace is that there are thousands of developers;

12   there are thousands of developers who have apps with consumer

13   spend.  Right?  And those are the developers that we're talking

14   about who pay the service fee.

15   And the distribution of those developers is very uneven.

16   You have this long tail of developers who are very, very small;

17   and then you have, you know, a very small number of developers

18   who are very, very big, who generate hundreds of millions of

19   dollars in consumer spend every year.

20   And so those are the developers, of course, with the

21   really popular apps and who are able -- some of those

22   developers are able to sway the consumers from one store to the

23   other.

24   So, but all of those small developers, the tail of

25   developers, are paying 30 percent.  Or at least, I should say,

1    they did pay 30 percent until last July, about a year ago.  And

2    Google reduced the service fee rate to 15 percent on the first

3    $1 million of consumer spend.  And when they did that, it's

4    like 97 percent, or some number like that, of developers are

5    now paying 15 percent because, of course, they don't earn a

6    million dollars.

7        **THE COURT:**  Okay.  Pass-through rate, you were about to

8    say something about that.

9        **DR. BURTIS:**  Well, I just wanted to --

10        **THE COURT:**  First, what does that 89.9 percent -- what

11    does that represent?

12        **DR. BURTIS:**  So the way that this works, and the way that

13    it works within the context of the plaintiffs' claims here, is

14    that the plaintiffs are claiming that this service fee rate is

15    too high and that in the but-for world, it would be lower.  And

16    the developers are the ones who pay that service fee.  Right?

17    And then the developers set prices.  They set the prices of the

18    apps and these in-app purchases and subscriptions.

19        And the question is:  When the developers get a lower

20    service fee rate, do they pass it through to the consumers in

21    lower prices?

22        And in Dr. Singer's model here, he uses 89.9 percent as

23    the average pass-through rate.  So --

24        **THE COURT:**  All right.  So one way of looking at it is,

25    for every dollar in service fees, the developer is having the

1    consumer pay 89.9 cents of it.

2        **DR. BURTIS:**  I would say every dollar in savings --

3    right? -- between the actual and the but-for world,

4    89.9 percent of it gets passed through to the consumers in

5    lower prices.

6        **THE COURT:**  All right.  Okay.

7        **DR. SINGER:**  Your Honor, is it okay if I respond to a few

8    things that she said?

9        **THE COURT:**  Okay.  I don't want to derail her too much,

10   but go ahead.  And Dr. Burtis can certainly do the same.

11       **DR. BURTIS:**  No, that's fine.  I'm done.

12       **DR. SINGER:**  And I'll make it very, very quick, I hope;

13   and then we can go to the next point, which is the

14   Landes-Posner model for the in-app aftermarket services.

15       Just four very quick points.  She said that every -- every

16   input into the model is an average or an aggregate.  I just

17   want to point out that's not quite true.

18       The marginal cost is a key input to the model.  And the

19   marginal cost -- this is Google's marginal cost for operating

20   the store, which I've estimated to be between 7 and 10 percent,

21   depending on which cost of revenues, depending on which cost

22   you include.  I wouldn't call that an average marginal cost.  I

23   wouldn't call that an aggregate.  It's just Google's marginal

24   cost, just an input to the model.

25       I will grant you that the pass-through rate that I use to

```
 1   come up with the but-for headline take rate is the average

 2   across all the individual Google categories over which I

 3   estimated a pass-through as a preview of the pass-through

 4   debate.  But as you may or may not know, I have

 5   category-specific pass-through rates.

 6        But when I go to project a but-for take rate that's going

 7   to mimic this kind of singular uniform but-for rate that Google

 8   uses in the actual world, I need it to spit out one number.  So

 9   I can't put in every individual pass-through rate by category.

10   I put in the average pass-through rate.

11        THE COURT:  We do this all the time.  There's nothing

12   wrong with an average.  I mean --

13        DR. SINGER:  No, I don't have a problem with that.  Just,

14   in this model, in this circumstance, it's calling for an

15   average.  I have --

16        THE COURT:  Unless Dr. Burtis says the average is

17   misleading because the range is so huge, it's a number that

18   doesn't really exist anywhere.

19        Is that your --

20        DR. BURTIS:  Yeah, that's it.  That would be --

21        THE COURT:  And why is that?

22        DR. BURTIS:  -- a good guess.

23        THE COURT:  I can't imagine Google has that many options

24   that it gives to people.

25        DR. BURTIS:  Oh, but this is the pass-through rate.
```

1      **THE COURT:**  No, no.  For example, that 3.99 product price

2      rate, you said that was a misleading average.  But why is that?

3      **DR. BURTIS:**  Well, the 3.99 is the developer's price, the

4      developer's price of an app.  And apps can be --

5      **THE COURT:**  It's an average.  It's Dr. Singer's average

6      for that.

7      **DR. BURTIS:**  Yes.

8      **THE COURT:**  Yeah.

9      **DR. BURTIS:**  And, I mean, apps are -- the prices of apps

10     are highly variable.  But --

11     **THE COURT:**  I don't have a problem with that.  But what's

12     wrong with using an average, even if they're highly variable?

13     **DR. BURTIS:**  So in general, the -- I'm going to -- I'll

14     use the pass-through rate as my example here and not the price,

15     because it matters.

16     The question is:  If you use an average, is there -- as

17     you put it; right? -- is there so substantial variation

18     underneath that average that you can't get the conclusions that

19     you need to get?  Do you need to go more into the data to

20     really understand what the conclusion of the analysis is?

21     So Dr. Singer has a pass-through rate of 89.9 percent.

22     Even his estimates, you know, when he does these individual

23     pass-through rates, vary from, like -- I don't have his in

24     front of me, but it's like 26 percent to 99.99 percent.  Okay?

25     Mine, the pass-through rates that I have found using data,

1   many, many of those pass-through rates are zero.  And so using

2   an average in this particular -- for this particular input will

3   generate much -- substantively different results, depending on

4   which of those numbers you put into the model.

5       **THE COURT:**  All right.  So let's go with that.  That

6   doesn't mean the model itself is so flawed that nobody would --

7   no reasonable economist would use it.  I mean, you don't like

8   the inputs.  That's perfectly fine.  That would be something

9   for the trier of fact to take into account, were the inputs

10  accurate or not.  But as a concept, a couple higher levels, the

11  model itself is okay.  Is that fair?

12      **DR. BURTIS:**  As I said, the model exists in the

13  literature; and I'm not here to say that this is a model that

14  nobody uses.  I won't say that about this model.  Whether it's

15  the right model, I don't know, and I don't have an opinion.

16      But I guess my overall point is it is a model that can

17  only return one answer for everybody.  Either everybody's

18  impacted or everybody's not.

19      **THE COURT:**  I'm trying to figure out why, as a practical

20  matter in an antitrust case, why is that a problem?  If Google

21  has a 30 percent number -- I know you disagree with how widely

22  that's used.  But it looked to me like there was a fair amount

23  of evidence that 30 percent is a number that Google used

24  internally and externally.  So what's wrong with saying, "Well,

25  it should have been 15, not 30"?

1          **DR. BURTIS:**  So, Your Honor, for example, I know that,

2    you know, in the broader landscape of this litigation, there

3    are individual developers who are bringing claims against

4    Google and they might want to use this model; but if they use

5    this model, they're going to come and they're going to have

6    their own set of inputs.  And their -- and, you know, the fight

7    will be about:  Well, is that input the right input?

8          And conceivably, you know, if you have a bunch of big

9    developers, they could have -- each one of them could have

10   their own model.  You know, I don't know that it's necessarily

11   going to be this one; but if it's this type of model, then it's

12   going to be different for different developers.

13         **THE COURT:**  Okay.  But we're looking at a class now, a

14   putative class.  Whether it gets certified or not, we shall

15   see.

16         But as a technique for a putative class, what, in your

17   view, is fundamentally junk science -- because that's sort of

18   the buzzword test -- about coming up with one but-for

19   pass-through rate for the class?

20         **DR. BURTIS:**  Well, that one's -- that's a big question,

21   Your Honor.  So I thought you were going to ask me about the

22   model, and now you're going to ask me about pass-through rate.

23   So the pass-through rate is a much larger discussion.  And if

24   we want to talk about that, I can, and the methodology that is

25   used to generate that.

 1          Regarding this model, I would say, I don't think this
 2    model itself is junk science.  I wouldn't say that.  All I'm
 3    saying here is that, you know, Dr. Singer, he didn't try to
 4    adapt the model, to really test the issue of common impact
 5    here.  He didn't do anything to test.  And the way that I think
 6    about what we're doing at this stage of the litigation is, we
 7    have to answer that question.  Can we make the assumption that
 8    there's a single model with a single set of inputs that fairly
 9    represents all these developers?
10          That's what he should have done, but he didn't.  He just
11    said:  You know what?  Here's the model.  I'm going to use all
12    these averages, and I get a result and it applies to everybody.
13          And so I think, when you do these things, that there's
14    something that precedes using a model like this that is all
15    built on averages, and that analysis is missing.
16          **THE COURT:**  What is that?  What analysis is missing?
17          **DR. BURTIS:**  Well, we could talk about pass-through rate.
18    Right?  Should we put in one pass-through rate?  And we can
19    talk about that, because that's a large discussion.
20          **THE COURT:**  That's what I'm asking.
21          **DR. BURTIS:**  Yes.  Yeah.
22          **THE COURT:**  Okay.  So let me just try it again.
23          There is evidence in the record that Google itself has a
24    30 percent number -- okay? -- for everybody.  It gets tailored
25    over time.  You can have different deals.  But when you walk

 1   into the Google restaurant, the price on the menu is

 2   30 percent, and you can have a conversation with your server at

 3   that point about whether you're going to get a special deal.

 4       What is wrong about -- I'm just not following why you

 5   think it's so fundamentally wrong for a but-for model to have a

 6   single starting point number as well.

 7       **DR. BURTIS:**  Because it is the way that competition takes

 8   place in this industry.  Because the way that these app stores

 9   compete with one another -- and it's not just Google, but it's

10   Samsung and Amazon -- they don't reduce their service fee rates

11   across the board.  You know, what they do is they say:  Oh,

12   here's a really important set of developers, and we need those

13   developers to stay on or to get on our App Store, and so we are

14   going to give them -- we're going to compete for them.

15       And so the plaintiffs' allegation is here:  In the but-for

16   world, there would be more competition.  Well, okay.  How would

17   that competition work?  It would work the same way that it does

18   in the actual world.  These app stores would go after those

19   developers.  There wouldn't be a reduction in the service fee

20   rate from whatever it is now to what Dr. Singer has found with

21   one of his models.  That's just not the way that it works in

22   the actual world.

23       **THE COURT:**  Well, how does it work, in your view?

24       **DR. BURTIS:**  It works the way that I was trying to

25   describe.  Google says:  Oh -- or Samsung.

```
 1         Like, Samsung, for example, Epic was a really -- you know,
 2    it was a big deal to get Epic in their store.  So they offered
 3    them a special deal.  When Amazon was competing for developers,
 4    they went out -- they wanted game developers because the game
 5    developers have a lot of consumers; and so Amazon went after a
 6    small set of game developers with really popular game apps.
 7    And so that's the way these stores compete with one another.
 8         And so if you say, "Well, there's going to be more
 9    competition in the but-for world," well, there's going to be
10    more of that.
11         THE COURT:  Well, okay.  I thought I had asked you whether
12    you knew how many developers were off of the 30 percent rate.
13    I think you answered you didn't know.
14         So the fact that there may be an Epic here and there, why
15    does that fundamentally throw off the idea that you can have a
16    uniform number for class purposes?
17         DR. BURTIS:  So, I'm sorry.  Are you asking me does it
18    matter how many there are?
19         THE COURT:  If you don't know how many people get a
20    non-30 percent rate, how can -- your argument seems to be:  Oh,
21    there's so much individualized negotiation.  But what I hear
22    you also saying is you don't know how much individualized
23    negotiation there actually is.
24         So I understand that -- look, in every case, every
25    price-fixing case, every Section 2 case, every Section 7 case,
```

 1   there are variables.  There is no -- I have never seen an

 2   antitrust case where everybody in a class was treated exactly

 3   the same way.  And that's okay.  We don't need that.

 4   Otherwise, you'd never have a class certified.

 5         We just need a reasonable method that would allow me to

 6   decide whether or not the antitrust injury for the consumers is

 7   something I can determine on a class-wide basis reasonably.

 8   Not with the precision of splitting an atom; just reasonably.

 9         And I'm still not -- and, okay.  I understand some big

10   players get sweet deals.  They're not going to pay 30 percent.

11   They might pay 10 or 15 or something.  Or they might have

12   ladders:  first 5 million is 30, next 5 million is 10.

13         But how does that derail Dr. Singer's fundamental

14   proposition that there is at least one number that reasonably

15   fits the class?

16         **DR. BURTIS:**  Well, I would say, Your Honor, that,

17   you know, if -- what you're describing is that there are really

18   big differences between -- even if it's a small number of

19   large, important customers and a large number of very small

20   customers.  And to the extent there are those fundamental

21   differences, then we should separate them and treat them

22   differently.

23         **DR. SINGER:**  May I just weigh in very quickly?

24         **THE COURT:**  Sure.

25         **DR. SINGER:**  Then we can change and go to the next topic.

1        **THE COURT:**  Yes.

2        **DR. SINGER:**  We've got to get down the line.

3        I just want to say two things left, back to what

4   Dr. Burtis said.

5        One, she made a point about that the model, you know, you

6   put in a different but-for market share and the but-for

7   headline rate changes.  Of course it does.  She didn't say it

8   changes severely because she couldn't.  Right?

9        So I think the best estimate that I can go out and find in

10  the literature for the but-for headline market share in a world

11  in which Google refrains from the restraints that it used to

12  end competition in the app distribution market was to look at

13  how much share loss AT&T suffered after its tie was broken

14  between local access and long distance telephony.  That turned

15  out to be 60 percent.  In other words, I allow Google to

16  maintain a 60 percent share of all transactions in the but-for

17  world.

18       But if I'm wrong and Dr. Burtis thinks that I'm being too

19  aggressive and the right number should be 70 percent, you could

20  put the number 70 percent in the Rochet-Tirole model and it

21  would generate a slightly different but-for take rate.

22       But that's a fight about the inputs.  I don't hear that as

23  being an issue that implicates individualized analysis.  It's

24  all done using common methods and common evidence.

25       I'd like to make just one last point.  Then we can move

1    on, if that's okay.  You asked her for the --

2       **THE COURT:**  The issue is, your common approach is gliding

3    over glaring disparate -- disparately situated developers.  And

4    how are you going to assure me that that's not the case?

5       **DR. SINGER:**  Right.  It's not because the deviations from

6    the headline rate in the actual are so limited.

7       Dr. Burtis studies three examples of discounts.  Right?

8    One of them is that LRAP program, L-R-A-P, Living Room

9    Accelerator.  50, 50 developers in that.  Okay?  Of all the

10   hundreds of thousands of developers, there were 50.

11      The next experiment she examines is the subscription

12   experiment.  And there were a lot of subscription -- there were

13   a bunch of developers that have subscription products.  But

14   everybody who has a subscription product -- if you or I came up

15   with a subscription app, we would be eligible for the

16   15 percent take rate in Year 2 if our customers hung around for

17   two years.  No individualized.

18      And the third thing she studies, I think, is the

19   million-dollar -- you know, the first million dollars for small

20   businesses.  All that applies commonly.  There's no individual

21   negotiation there.

22      And if it's okay, those are the only --

23      **THE COURT:**  Well, let me ask you --

24      **DR. SINGER:**  Yes.  Oh, you wanted a number.  A number

25   roughly?

 1          THE COURT:  No.  Just, where in your report do you look at

 2    the deviation from the headline rate?

 3          DR. SINGER:  Oh.  What I do is, in each app category --

 4    Your Honor, I believe it's Tables 13 and 14 -- I have

 5    calculated what every developer, by category, was able to

 6    secure in the actual world off the headline rate of 30 percent.

 7    And if the set of developers --

 8          THE COURT:  13 and 14?

 9          DR. SINGER:  Yes.  Those are my damages by -- I'm doing

10    this by memory, but Singer initial report, 13 and 14, shows

11    damages first in the app distribution market by category.

12          THE COURT:  I'm not seeing -- what page is that on?  This

13    is your initial report; right?

14          DR. SINGER:  Yes.  If it's not 13 and 14, it's 14 and 15.

15    It's pretty late in the report.

16          I'll pause while we find it.  Is it important?

17          THE COURT:  Yes, this matters to me.  I'd like to --

18          DR. SINGER:  Yes.  It was Table 13, page 133, Your Honor.

19          THE COURT:  Oh, 133.  Okay.  All right.

20          All right.  So what is Table 13 showing?

21          DR. SINGER:  Table 13 is showing how to arrive at

22    aggregate damages by app category.

23          And your question, if I recall it correctly, is:  How did

24    I take into consideration the discounts that were actually

25    achieved in the -- that were achieved in the actual world off

1    the headline rate, and how did I project those in the but-for

2    world?

3        So if you look at the column that's titled "Actual Take

4    Rate," you can see there is some variation.  Not much.  I think

5    Table 14 might be more illustrative.

6        Let's look at Table 14, if that's okay.  Table 14 is on

7    page 134.  You'll see there is some variation.  You'll see that

8    Music and Audio got a big discount off the actual take rate for

9    in-app purchases.  You see that, Your Honor, the 19.1 percent?

10       **THE COURT:**  Let's just go -- I'm more interested in 13.

11   This is the Google Play market; right?

12       **DR. SINGER:**  That's the primary market.  That's correct.

13       **THE COURT:**  Let's look at that one first.

14       **DR. SINGER:**  That's fine.

15       **THE COURT:**  All right.  There's actual take rate.  Tiny

16   variations.  What does that mean?

17       **DR. SINGER:**  That means there was almost no deviation,

18   almost no transactions that occurred off the 30 percent default

19   headline rate in the primary market for app distribution.

20       **THE COURT:**  And how did you -- let's just pick Food and

21   Drink, 29.9 percent.

22       **DR. SINGER:**  Right.  So I can go into the database,

23   Your Honor, and for each transaction in the database, I get to

24   see the take rate, the applicable take rate that was paid by

25   the developer on that transaction.

1      **THE COURT:**  Actual pays?

2      **DR. SINGER:**  The actual take rate.  That's correct.

3      And so you'll see there's not much variation -- I'm

4      looking at Table 13.  There's not much deviation from the

5      30 percent, which I think just makes my point that --

6      **THE COURT:**  That would account for individual deals and --

7      **DR. SINGER:**  That accounts for all individual deals.

8      If you go to Table 14, you'll see.  Some --

9      **THE COURT:**  No.  I like 13.

10     **DR. SINGER:**  I was trying to help Dr. Burtis.

11     **THE COURT:**  All right.  So that is your way of -- you

12     actually tested using Google's actual developer fee contracts

13     and agreements?

14     **DR. SINGER:**  I'm looking at the transaction data.  I don't

15     have to look at the agreements.  I have the transaction data

16     which shows me the actual discounts that were secured.  And

17     this is my --

18     **THE COURT:**  That would account for every individualized

19     deal?

20     **DR. SINGER:**  Correct.  And there weren't that many of

21     them.  And this is key.

22     **THE COURT:**  Dr. Burtis, that looks pretty good.  What's

23     wrong with that?

24     **DR. BURTIS:**  So, well, it doesn't account for everything

25     because it doesn't account for the individualized deals where

1    they're negotiating the services, but that is a small number of

2    developers.

3         **THE COURT:**  Dr. Singer, I think, just said it did.  So --

4         **DR. BURTIS:**  It does not.

5         **THE COURT:**  Why is that?

6         **DR. BURTIS:**  Because it just doesn't.  In the transactions

7    data, that's just not there.

8         **THE COURT:**  Well, "It just doesn't" doesn't help me.

9         Food and Drink, Dr. Singer is saying he looked at every

10   service fee agreement in the Food and Drink app category, every

11   one.

12        **DR. BURTIS:**  So --

13        **DR. SINGER:**  Every transaction.

14        **THE COURT:**  What did he leave out?

15        **DR. BURTIS:**  So --

16        **THE COURT:**  How could he have missed anything?

17        **DR. BURTIS:**  If he is looking at the service fee rates in

18   the transactions data and he did it right, then that would be

19   correct.

20        But you asked him the question about the individualized

21   deals.  And all I'm saying is that there are some of those

22   deals, and you are not going to see the effects of those deals

23   by looking at the service fee rate because what they're doing

24   is they're negotiating for services.  You know, they want

25   certain things from Google.  They're not going to have a

1  different rate.  They're going to have more, you know,

2  something.  More -- I won't say it out loud but --

3       **THE COURT:**  All I care about is the rate.  I mean, what --

4       **DR. BURTIS:**  Okay.  I mean --

5       **THE COURT:**  Well, it's not "okay."  This case is about the

6  rate.  What difference does it make whether they got a

7  complimentary doormat because they paid a high rate?  I mean,

8  they're still paying the rate.  I don't really understand what

9  you're saying.

10      **DR. BURTIS:**  Well, I would say it is the way that Google

11  has competed.  And so in the but-for world, if there's more

12  competition, then Google would compete more like it did in the

13  actual world, and so you'd have to take account of that other

14  way of competing.

15      **THE COURT:**  Well, let me -- okay.  Just looking at that

16  Table 13 in Dr. Singer's opening report -- and I'm looking at

17  Docket Number 254-4, which, unfortunately, is sealed, at least

18  for the moment -- I'm not hearing anything from you,

19  Dr. Burtis, that tells me that the actual take rate number for

20  each of those categories of apps is underinclusive in any way.

21  In other words, I'm not hearing you say that any rate actually

22  paid by a developer in one of those app categories was not

23  included.  Is that right?  You're not saying that they --

24  anything was omitted.

25      **DR. BURTIS:**  Well, how far did you go in your data?

1    **DR. SINGER:**  This has every transaction during the class

2    period.

3        **DR. BURTIS:**  All the way through 2021?

4        **DR. SINGER:**  Yes.

5        **DR. BURTIS:**  So you're showing everybody who got a lower

6    rate in July of 2021?  Because --

7        **DR. SINGER:**  No, no, no.  Across the entire class period.

8        Just to be clear, any discount that you got -- any

9    discount that you got in the actual world -- right? -- from the

10   headline take rate was applied in the but-for world from a

11   lower headline take rate -- right? -- assuming that Google

12   refrained from engaging in the challenged conduct.

13       **DR. BURTIS:**  So, Your Honor, if you look at my Figure 4,

14   you can see it by year.

15       **THE COURT:**  Which one?

16       **DR. BURTIS:**  Figure 4.

17       **THE COURT:**  In your report?

18       **DR. BURTIS:**  Yes.  It's on page 44.

19       And you can see that over time, the share of the

20   developers -- this is the U.S. developers, the class of

21   U.S. developers.  You can see that that share fell over time.

22       **THE COURT:**  The service fee rate?

23       **DR. BURTIS:**  The share of developers who were getting the

24   30 percent rate.

25       **THE COURT:**  Oh, I'm sorry.  Figure 4, you said.

1          **DR. BURTIS:** Yes.

2          **THE COURT:** Okay. Page 45. Okay.

3          Okay. So what does that have to say about the

4   completeness of the data used in Table 13 in Dr. Singer's

5   report?

6          **DR. BURTIS:** Well, you know, I didn't check his Table 13.

7   They should be -- if -- you know, I use this transactions data

8   to do this too; so they should be the same.

9          **DR. SINGER:** I'm happy to move on to 1(b), the take rate

10  for the in-app transactions, if you'd like; or if you'd like to

11  skip right to pass-through --

12         **THE COURT:** Well, I just --

13         **DR. SINGER:** Oh, sorry. I didn't know --

14         **THE COURT:** Table 13, I just want to be crystal clear

15  about this. So you're saying, Dr. Singer -- and you can

16  correct me if I misunderstood -- but the actual take rate in

17  Table 13, and I guess also for Table 14, same column, accounts

18  for every service fee agreement in each of those app categories

19  for the time period that you had the data?

20         **DR. SINGER:** It does, Your Honor.

21         And I just want to make sure. You're using the word

22  "agreement." I didn't study the agreements. You probably

23  don't want me to be reading agreements. I have the transaction

24  data.

25         **THE COURT:** That's what I mean.

1    **DR. SINGER:**  Yes.

2    **THE COURT:**  The actual --

3    **DR. SINGER:**  Transactions.

4    **THE COURT:**  The actual charge --

5    **DR. SINGER:**  Yes.

6    **THE COURT:**  -- from Google to the developer?

7    **DR. SINGER:**  Correct.  Every one.

8    **THE COURT:**  So the variation is quite slight?

9    **DR. SINGER:**  It's quite slight in that initial app

10   distribution market; that is correct.

11       You see a little more variation in Table 14.  I don't know

12   why I'm so excited to take you there.  But you see a little

13   more variation in Table 14, and we can talk about --

14   **THE COURT:**  Even taking Dr. Burtis's comment that there

15   were some heavyweights, so to speak, who got special deals,

16   once they're all aggregated, the effect is quite tiny in terms

17   of getting off the 30 percent rate?

18   **DR. SINGER:**  In the app distribution market, that is true.

19   That's not necessarily the case when we go to in-app.  But

20   whatever discounts a category was able to secure, those same

21   discounts off a lower headline rate were applied in the but-for

22   world.

23       **THE COURT:**  Just last chance, Dr. Burtis.

24       **DR. BURTIS:**  I'm good.  I'm good, Your Honor.  I'm happy

25   to move on.

1          **THE COURT:**  Nothing to say about that?

2          **DR. BURTIS:**  It is not part of our central dispute.  So

3     I'm happy to move on.

4          **THE COURT:**  Okay.  1(b).

5          **DR. SINGER:**  Excellent.  And I'll make this quick and

6     painless, I hope.

7          So this is -- you're going to see a lot of symmetry here.

8     I just have three points for how I estimated the but-for take

9     rate for in-app services.

10          So Point Number 1, I use a classic model from the

11     literature, the Landes-Posner model, which is generally

12     accepted and fits the facts of the case.

13          Now, unlike app distribution, where Google was playing the

14     role of a matchmaker, the aftermarket for in-app services is a

15     one-sided market between developers on the one hand and

16     suppliers of these aftermarket services on the other, with no

17     indirect network effects.  It is a simple transaction between

18     the buyer, which is the developer, and a seller of the

19     aftermarket services and includes things such as payment

20     processing, recordkeeping, and unlocking of content needed to

21     consummate a purchase of in-app content through the app.

22          Now, given the lack of indirect network effects, we need a

23     one-sided model to reflect the one-sided nature of the

24     aftermarket for in-app services.

25          And there's good news here as well, Your Honor, in that we

1  have two famous antitrust scholars, William Landis and Judge

2  Richard Posner, who have derived how a dominant firm changes

3  its prices in response to entry by -- this is a technical

4  term -- a competent fringe, or just by a new set of entrants

5  that hadn't been there, now upsetting the dominant firm's

6  monopoly.  They have derived a model.  It's very common and

7  classic in the literature that economists use for these sorts

8  of situations.

9       Point Number 2, the Landes-Posner model employs real-world

10  data from this case.

11      If I could put up Slide 3, Your Honor, it's going to look

12  just like the slide for the Tirole model, but now we're looking

13  at the Landes-Posner, what went into estimating the but-for

14  take rate for in-app services.

15      Do we have that up?  One down.  You're on Rochet-Tirole.

16  Can you come down to Posner?  There you go.  Thank you so much.

17      So armed with the right model, we now have to provide

18  inputs to the model and determine changes in the price for

19  in-app aftermarket services.

20      And this is where Dr. Burtis and I get into a similar

21  dispute from what he just had.  She takes issue with my

22  pass-through, which, again, is an input; but we're having an

23  entire debate over pass-through --

24      **THE COURT:**  To start, what does that 29.2 percent take

25  rate mean?

1    **DR. SINGER:**  This is the actual -- this is the actual take

2    rate -- sorry.  Which -- I don't see it in front of me.  Let me

3    come over here.

4    **THE COURT:**  Your columns are redacted.  The third thing

5    down.

6    **DR. BURTIS:**  It's the actual service fee rate on average.

7    **THE COURT:**  Sorry?

8    **DR. BURTIS:**  It's the average.  It's the average service

9    fee rate for in-app purchases.

10    **THE COURT:**  I know, but what does that mean?  Who's paying

11    what to whom --

12    **DR. SINGER:**  Oh.

13    **THE COURT:**  -- in that 29.2 percent?

14    **DR. SINGER:**  Yes.  That is what developers pay, on

15    average, to transact in these in-app aftermarket transactions

16    to Google.  That is, Google is taking 29.3, on average, of the

17    revenue -- right? -- away from the developer and pocketing it.

18    Right?  That's what the 29.3 stands for.

19    **THE COURT:**  For billing services or whatever?

20    **DR. SINGER:**  Well, a few more things.  Yes, a few more

21    things.  I went through that list of recordkeeping, payment

22    processor.  And, you know, give you an idea, the competitive

23    rate -- you saw this in my report, Your Honor -- for payment

24    processing is between about 2 and 4 percent.

25    May I go on?

1          **THE COURT:**  Yeah, please.

2          **DR. SINGER:**  Okay.  All right.  Now, here, too, I use all

3     of the real-world data available to me.  Just an example of

4     some of the rows, consumer expenditures on in-app products and

5     Google's revenues were obtained from Google's financial and

6     transaction data.  And the table shows how I calibrated the

7     model based on the real-world data to get the but-for rate for

8     this in-app aftermarket.  Okay?

9          Point Number 3, other than suggesting it can't be used

10    marketwide, Dr. Burtis, again, largely gives the Landes-Posner

11    model a pass.  She doesn't dispute that Landes-Posner is

12    standard or that it's widely accepted in the literature.  She,

13    again, complains that I performed a marketwide analysis rather

14    than solving for hundreds or thousands of but-for headline take

15    rates again.  And she's wrong for similar reasons that I think

16    we just went through for app distribution.

17         Again, Google doesn't negotiate take rates for in-app

18    support services individually with tens of thousands of app

19    developers.  It would make zero economic sense.  That's all

20    they'd be doing all day if that's what they did.

21         The second point --

22         **THE COURT:**  Well, in Table 14, the take rate -- actual

23    take rate is much more variable.

24         **DR. SINGER:**  It is.  And so I can go to some examples.

25    Like in the music category, Your Honor, on Table 14, you'll see

1    that those developers did very well at securing a discount,

2    19.1 percent, on average.

3        I think we have some --

4        **THE COURT:**  Why is a uniform number, then, going to be

5    useful in this --

6        **DR. SINGER:**  Because in the but-for world, the discount

7    that these big guys, like Pandora, were able to achieve would

8    be achieved off of a lower but-for headline rate.  We still

9    need a model to produce for us a singular but-for headline

10   rate.  From that lower rate, we then can allow for some

11   individual prices or variation by categories to replicate the

12   kind of discounts that were secured in the actual world.

13       But what the model is going to give us is a singular

14   headline rate that would serve, just like in the actual world,

15   as a starting point for all negotiations.

16       **THE COURT:**  Dr. Burtis, what's wrong with that?

17       **DR. BURTIS:**  You know, I would say the same thing,

18   basically, Your Honor.

19       **THE COURT:**  Okay.  I mean, just to break that down a

20   little bit, you don't take issue with the Landes-Posner model

21   as a model for the case; is that right?

22       **DR. BURTIS:**  Economists use this -- these kinds of

23   equations.  I certainly wouldn't say that this is, you know,

24   junk science in that regard.  I think the issue for me is

25   whether this model is capable of answering the question of

 1    whether all of those rates would really fall in the but-for

 2    world.  And, you know, it is a model that doesn't provide us

 3    with the opportunity to really determine that question.  It

 4    just --

 5        THE COURT:  But why?  I know that's your position.  But

 6    why?

 7        DR. BURTIS:  You mean why would it be possible that not

 8    all the rates --

 9        THE COURT:  Why do you tell me that this won't work?  What

10    you just said, why is that the case?

11        DR. BURTIS:  Oh, because it's the mechanics of the model,

12    Your Honor.  I mean, you only get one answer out of this model.

13    You get -- you either get a reduction or you don't get a

14    reduction.  So there's -- the model doesn't give us the

15    opportunity to answer the question:  Is it possible that

16    somebody's not impacted?

17        THE COURT:  Okay.  But does the data show that --

18    anything's possible, but you've got to look at the data in the

19    world as it is today.  Did you find anything in the data of the

20    world that says your concern has some teeth to it?  In other

21    words, it has to be more than just economic abstraction.  You

22    have to say this model doesn't fit the actual data we have.

23        Do you have that?

24        DR. BURTIS:  Yes.  And in my report, I talk about the way

25    that these app stores compete and the way that they compete for

1  individual developers.  And so, in my view, in the but-for

2  world, there would be -- even with more competition, even if we

3  assume, in the but-for world, Google has more competition, if

4  we also believe that that competition is going to manifest

5  itself the same way that it does in the actual world, there

6  will be developers who will not get a lower service fee rate.

7       **THE COURT:**  Okay.  I don't have a problem with that.  But

8  why does that mean you have to throw out everything Dr. Singer

9  did?

10      **DR. BURTIS:**  Because his model doesn't allow for that

11  possibility.  He -- he -- you know, it's --

12      **THE COURT:**  Let me struggle to put it differently, if I

13  just might jump in.  Okay?  But what is the weight of that?  I

14  mean, if his model doesn't allow it but it has a 5 percent

15  impact, that's okay.  If his model doesn't allow it but it

16  throws off the numbers by 55 percent, that would be an issue.

17      So we're not looking for perfection.  This is an antitrust

18  case in a United States District Court.  So I'm trying to

19  figure out, in the messy world of apps and consumers and

20  developers and platforms -- we're not looking for an artificial

21  uniformity or singularity.  If it doesn't exist in the real

22  world, we're not going to demand one in a model.

23      So it may be -- I mean, did you quantify how much of

24  this -- what is the weight or the impact on Dr. Singer's model?

25  I mean, is it so bad that it's throwing out all the data, or is

1    it just a couple of things here and there are not getting

2    picked up?

3    **DR. BURTIS:** So I guess -- so I did not try to develop an

4    alternative model that I could use.

5    **THE COURT:** I'm not asking you that.

6    **DR. BURTIS:** Okay.

7    **THE COURT:** I'm asking you to pick apart your colleague

8    here. Just tell me why he's wrong.

9    And I understand some things may be missing. I'm trying

10    to get a sense of the gravity of that. All right? I'm okay --

11    I'll just be candid. I'm okay if a few things are missing and

12    it doesn't -- it's a tenth of a percentage point. I'm just

13    using this as illustrations. I'm not okay if a few things are

14    missing or some things are missing and it's a 50 percent -- the

15    target's off by 50 percent. I'm not hearing where you are on

16    that; so help me understand.

17    **DR. BURTIS:** So I would say, Your Honor, the -- so the

18    magnitude issue is more like a damages issue. I think that

19    that's the kind of the question that you're asking me. Like,

20    how bad is this model in terms of the damages? And, you know,

21    I think that depends on who this model doesn't fit.

22    If it turns out that it doesn't fit the small developers,

23    well, they're small -- right? -- and so the difference in the

24    damages will be small; but if this model doesn't fit, you know,

25    the top ten developers, then that's huge because those top --

1        THE COURT:  I'm asking you, just to jump in, you keep

2   saying "if."  Does this fit it or not?  I need your opinion.  I

3   mean, I understand there are lots of "ifs," but what is your

4   conclusion?  Does Dr. Singer's model actually fit the small

5   developers, the whale developers, or does it not?  That's what

6   I'm trying to understand.

7        DR. BURTIS:  I think it would -- well, again, I would like

8   to move to the issue of pass-through because I think --

9        THE COURT:  Let's answer my question first.  Okay?

10        DR. BURTIS:  Well, if we -- if we -- it wouldn't fit a lot

11   of developers.  It would be a big deal because, in my view,

12   that pass-through number is very wrong.

13        THE COURT:  All right.  Well, did you quantify how many --

14        DR. BURTIS:  Yes.

15        THE COURT:  Where is --

16        DR. BURTIS:  There's all kinds of -- not in this model,

17   but I quantified the issue with regard to pass-through.

18        THE COURT:  Okay.  All right.  Well, all right.  If you

19   want to do it that way, that's fine.  Go ahead.

20        DR. SINGER:  Your Honor, I had one more point for --

21        THE COURT:  I want to hear the pass-through.

22        DR. SINGER:  Oh, I'm sorry.

23        DR. BURTIS:  Oh, you want to go to pass-through?

24        THE COURT:  Yes.

25        DR. SINGER:  I think I was designated as the presenter of

1  the pass-through, since it's my model.

2       THE COURT:  Well, I think I get it.

3       What's your -- just go ahead, yeah.

4       DR. BURTIS:  All right.  So I'm going to -- I'm going to

5  sort of jump to something sort of to the end.  Okay?  But it is

6  addressed in this.

7       So I want to go to my Slide 14.

8       THE COURT:  14.  All right.  What page is that?

9       DR. BURTIS:  I only have slides.  It's a slide.

10      THE COURT:  Oh, it's a slide?  Oh, okay.  Sorry.

11      DR. BURTIS:  Yeah.

12      THE COURT:  This thing you handed -- okay.  All right.

13      DR. BURTIS:  Okay.  So we can talk -- and we should -- we

14  should talk about the methodology that Dr. Singer used to find

15  the pass-through rate that he uses in his models, and he

16  also -- he also uses that in his damage model.

17      And just stepping back for a minute, Your Honor, the

18  models that we were looking at are -- Dr. Singer uses those to

19  find the but-for service fee rate.  Right?  And so the ultimate

20  question, though, for these consumers is:  Even if that service

21  fee rate was lower, did the developers pass those lower service

22  fee rates on to consumers in lower prices?

23      And so he not only uses the pass-through rate in that

24  model, but he uses the pass-through rate to answer that

25  fundamental question.  So it's a really important issue, and

1    this is a big, I think, dispute between us.  Okay?  So I can

2    talk about his methodology, or -- I'll give you a brief --

3    well, I don't know how to do this because it's long.  Do you

4    want me to?

5        **THE COURT:**  Whatever you'd like.  I'll tell you what,

6    though.  Let's take a -- we can take about a ten-minute break

7    and give the court reporter an opportunity to cool her hands

8    off.  So we'll start again at about 3:15.

9        **DR. BURTIS:**  Okay.

10        **THE CLERK:**  All rise.  Court is in recess.

11                    (Recess taken at 3:06 p.m.)

12                    (Proceedings resumed at 3:14 p.m.)

13        **DR. BURTIS:**  Okay?

14        **THE COURT:**  Please.

15        **DR. BURTIS:**  Okay.

16        **DR. SINGER:**  Your Honor -- oh, sorry.

17        May I make a suggestion?  Because we're going to be

18    debating my logit model, the appropriateness and reliability of

19    my logit model, I'm available, if you'd like me to go first --

20        **THE COURT:**  No.  We will.  I just want to have Dr. Burtis

21    round out her thought before we --

22        **DR. SINGER:**  Okay.

23        **THE COURT:**  -- took our break.

24        **DR. BURTIS:**  Okay.  Thank you, Your Honor.

25        So --

1    **THE COURT:**  Looking at Table 14.

2    **DR. BURTIS:**  Yes.  The slide on page 14 is an exhibit that

3  was in my report.

4    **THE COURT:**  Yes.

5    **DR. BURTIS:**  And we will talk about Dr. Singer's

6  methodology and how he got his pass-through rates.  I will tell

7  you now that that is a methodology that I've never seen used

8  before.  I mean, you were asking me these questions about,

9  you know, is this a standard methodology, about the other

10  models.  Dr. Singer's methodology for the pass-through rates is

11  not.  It is not standard.  I have never seen it before.

12    Dr. Singer was asked at his deposition if he's ever used

13  it before, and he said no, and he also said that he hasn't seen

14  it used.

15    **THE COURT:**  This is the one minus --

16    **DR. BURTIS:**  Yes.  One minus the share formula, correct.

17    **THE COURT:**  One minus the share.

18    **DR. BURTIS:**  One minus the share formula.

19    I've never seen it actually used in any article, even.

20  So, but we can talk about that.

21    The other two bars -- and what these represent are the

22  percentage of pass-through rates that are positive.  That's

23  what is on this graph.  And so I looked at the actual data.

24  Google did lower its service fee rate for certain developers

25  over time during the class period.

1          I was able to look at -- I had, like, four different

2    databases.  I was able to look at over 450,000 different -- I

3    call them "SKUs," which is either a paid app or an in-app

4    purchase or a subscription, and I looked at all three of those

5    different types of monetizations.

6          And what I found -- I just asked the question:  Did the --

7    did the price of that SKU fall after the service fee rate was

8    reduced?  And I found that in only 2 percent, over all of these

9    SKUs, only 2 percent fell.  And, by the way, this -- I did

10   this --

11         **THE COURT:**  Where is that in your report?

12       **DR. BURTIS:**  This is actually Figure 13 in my report.  So

13   it would be -- the discussion of that is around Figure 13.

14         **THE COURT:**  Okay.  All right.

15       **DR. BURTIS:**  And just to be clear, I did this by comparing

16   prices one month before the service fee rate fell and one month

17   after.  I did it six months before and six months after.  I

18   also said, I'm going to look over the life of the app.  Did the

19   price ever fall over the life of the app?  So I did all of

20   those different experiments.

21         This particular one is the one month before and the one

22   month after.

23         **THE COURT:**  All right.  Just, what page is that?

24       **DR. BURTIS:**  My pages are sticking together.

25         Does anybody know what page it is?

1          Oh, there it is.  It's page 102.

2      **THE COURT:**  Oh, okay.  And this is the one-month test?

3      **DR. BURTIS:**  This is a one-month test.  But all of the

4   results are reported in my report.

5      **THE COURT:**  Okay.  So --

6      **DR. BURTIS:**  They are substantively the same.

7      **THE COURT:**  Just one second.

8          I do not have a table on page 102 of your report.  I'm

9   looking at Docket Number -- it's the sealed version, 254-5.

10     **DR. BURTIS:**  Look at 103.

11     **THE COURT:**  103?  Figure 13 on 103?

12     **DR. BURTIS:**  Yes.

13     **THE COURT:**  Okay.  That's the one.  And this is the

14  one-month --

15     **DR. BURTIS:**  Yes.

16     **THE COURT:**  That's the same thing that we were looking at

17  in this chart.

18     **DR. BURTIS:**  Yes.

19     **THE COURT:**  Oh, I see.  Okay.

20         Okay.  Go ahead.

21     **DR. BURTIS:**  Okay.

22     **THE COURT:**  And what does this represent?

23     **DR. BURTIS:**  So the 2 percent represents, across all of

24  these different SKUs, 2 percent of those SKUs fell in price one

25  month after the service fee rate reduction.

 1        And I was looking at -- I tried to focus my attention on
 2    rate reductions that were at least ten points.  So it wasn't a
 3    rate reduction from, like, 30 to 29.  It had to go from -- if
 4    it started at 30, it had to be at least -- it had to go to at
 5    least 20.
 6        **THE COURT:**  And what does that 2 percent mean?
 7        **DR. BURTIS:**  What that means is that only 2 percent of
 8    those SKUs would have been at a lower price in the but-for
 9    world, and only those consumers then who purchased those SKUs
10    would have been impacted.
11        And, again, this is just -- this is based on the actual
12    data.  And I had four databases.  I had the transactions data.
13    I created my own data by scraping Google Play.  I had their
14    app-level data.  I asked them for more data, you know, so that
15    I could do these experiments.
16        And I will note that Dr. Williams, one of the developer
17    experts, did a similar analysis.  He didn't have all the
18    databases.  He didn't have my scraped database, for example.
19    And his experiment was a little different.  But for him, he
20    found 8 percent of the prices were lower after a service fee
21    rate reduction.
22        So the point is that we -- both of us are finding that
23    pass-through in this industry, a pass-through of a service fee
24    rate reduction, at least for the SKUs that we are looking at,
25    was very infrequent.

1      **THE COURT:**  And the number that Dr. Singer got, that

2    99.99 percent, that's based on the one minus share formula; is

3    that right?

4      **DR. BURTIS:**  Correct.

5      **THE COURT:**  Okay.  Tell me a little bit about

6    methodologically -- I get it.  Nobody's used it before.

7    Dr. Singer said he's never used it before.  What is it about it

8    methodologically that doesn't work, in your view?

9      **DR. BURTIS:**  Okay.  So, first, I want to tell you what it

10   is, but it sounds like you kind of know already.

11     I want to go to Slide 3.

12     **THE COURT:**  Slide 3.  Okay.

13     **DR. BURTIS:**  And, basically, this is what the methodology

14   is that Dr. Singer employed.  He takes -- he does this for a

15   developer in a category with a particular kind of monetization

16   type, like subscriptions, for example; and he counts the number

17   of sales that that developer made in that month.

18     **THE COURT:**  I'm with you on that.  Why doesn't -- what's

19   wrong with this?

20     **DR. BURTIS:**  Okay.

21     **THE COURT:**  Why is this, in your view, a bogus formula?

22     **DR. BURTIS:**  Okay.  So one thing I want to -- I want to

23   explain just the implication of doing it this way.

24     Remember when I said, you know -- I was talking about

25   developers.  And there's, like, thousands and thousands of

1    developers; and more than most of them are really, really

2    small.  Like, you know, 90 percent of them are really, really

3    small.  And that's also true of apps.  We have a lot of apps

4    that are really, really small.  So when you use this

5    methodology -- right? -- and you're calculating the share of

6    those apps in that way, every one of those shares is going to

7    be very, very small.

8        And so that -- that is why he gets the result that he

9    does -- right? -- because you have all these apps; each one of

10   them has a very, very small share; and the formula is one minus

11   that share.  And so that's kind of the intuition of what's

12   generating this result.

13       Okay.  But in my opinion, there are three flaws with this

14   methodology.

15       Okay.  So the first problem is that this formula, the one

16   minus the share formula, is the wrong formula for this case.

17   In this case, we have a service fee rate.  And that service fee

18   rate depends on price.  We call it an -- I've been calling it

19   an *ad valorem* cost.  Right?  So if the service fee is -- if the

20   price is a dollar and the service fee is 30 cents --

21   30 percent, then it's 30 cents.  But if the price is different

22   and that rate is still 30 percent, then the service fees in

23   dollars changes.  Okay?

24       And that is -- it is very different than a per unit cost

25   because those per unit costs don't depend on price.  The price

 1  can be whatever, you know, it is; and it's always going to be

 2  whatever -- whatever that cost is per unit.  You don't have

 3  that kind of circularity, if you will, between the service fee

 4  rate, which depends on price, and the price.  So you've got to

 5  treat these things differently.

 6      Dr. Singer's pass-through formula that he found in this

 7  article -- and we can go to Slide --

 8      **THE COURT:**  I have the article.

 9      **DR. BURTIS:**  -- 6.

10      **THE COURT:**  Yeah.

11      **DR. BURTIS:**  If you look at Slide 6, it brings out part of

12  the article.  And it says that the formulas in that article

13  assume a per unit tax.  So the formula is based on a per unit

14  tax, but what we have in this case is this *ad valorem* cost or

15  you can think of it as a tax.

16      So there's this fundamental difference between what this

17  formula is measuring and what Dr. Singer should have measured

18  in this case.  Okay?

19      **THE COURT:**  So, and the one minus share formula is not

20  captured in this Nathan Miller article; right?

21      **DR. BURTIS:**  It is, Your Honor.  But that formula is based

22  on a per unit cost.  And so that formula, it is in the article,

23  but it is the wrong formula for this case.

24      **THE COURT:**  And so when you say that you've never seen

25  Dr. Singer's one minus share formula used, it's because of

1    that?

2        **DR. BURTIS:**  Well, that -- that is part of it, yeah.  But

3    even -- so the formula itself, one minus the share, is coming

4    from a particular kind of demand model called the logit.  And

5    that logit demand model is used frequently in the literature,

6    usually to get at elasticities.

7        But economists do not use the logit model, even when they

8    have a per unit cost, to get at pass-through rates.  That's not

9    the way that we think about pass-through rates.  We don't use a

10   formula like that.  It's too restrictive.  Right?  There's too

11   many assumptions built into the logit model.

12       And there are articles, and I cite these in my report.  It

13   says, you know, if you use the logit model to do things like

14   pass-through, the restrictions are too severe and you're going

15   to get unreasonable results.  You're going to get results that

16   don't make economic sense.

17       And so even for a per unit cost, I haven't seen

18   economists -- when they study pass-through, I have not seen

19   them use that formula.

20       What we usually do and, you know, what I've done many

21   times -- and, you know, even whoever is on the other side of an

22   antitrust case, you know, we're always doing the same thing.

23   We're always saying:  Well, I want to look at the relationship

24   between cost and price.  I want to see what happens to price

25   when cost changes.

1       And that is the standard methodology that we use, and

2  that's the methodology that I used in the graph that we were

3  just looking at.

4       **THE COURT:**  Okay.  Let's just pause there.

5       Dr. Singer?

6       **DR. SINGER:**  Yes.  Thank you.

7       And Dr. Burtis went into a bit of 2(d), which is fine, in

8  that section.  And I have some really important points I'd like

9  to make in 2(d).  But I think because she came back to 2(a), to

10  attack the logit, I think it makes most sense if we take out

11  2(a) and then, if we could, maybe move to 2(d) --

12       **THE COURT:**  Fine.

13       **DR. SINGER:**  -- afterwards.

14       Okay.  So on the logit model, I just have four points.

15       But before I even start off, I just want to say this.

16  Dr. Burtis cited something I said during my deposition.  And

17  you should know, Your Honor, that I tend to do mostly

18  monopolization cases.  And just as Dr. Burtis said, when I look

19  at pass-through, as I'm doing right now in the *Pork Antitrust*

20  case, I'm looking at changes in the wholesale prices on changes

21  in the retail price.  Right?

22       In this case, by contrast, we have a problem, and that is

23  the take rate on 93 percent of the transactions in the

24  database --

25       Can you put up Slide 4, please?

1          92.4 percent of the transactions in the database were all

2     at that headline 30 percent rate.  It is impossible to try to

3     find how app prices vary in response to changes in take rates

4     when the take rates don't change.  It's a problem.  Right?

5          And even in that very teeny-tiny segment of the pie, the

6     3.1 percent, the 4-point -- where Dr. Burtis goes looking for

7     experiments to exploit, it's all botched.  And I'm going to

8     show that to you when we get to 2(d).  You can't get any

9     information out of those changes in the small part of the

10    triangle, small part of that figure.  Okay?

11         So let me now make my -- what we are trying to do is that,

12    given this limited sample of changes in take rates, I looked

13    for an economic model of consumer demand that would allow me to

14    make predictions of how an app developer would change its price

15    in response to a change in the take rate, given the nature of

16    the demand that that app developer faced.  Okay?  That's why

17    we're here.

18         Point Number 2, the logit model captures the demand faced

19    by app developers.  I couldn't use it if it didn't.  Okay?  The

20    logit model is a generally accepted methodology based on

21    published literature in the field.

22         Can I see Slide 5, please?

23         I was a little surprised when Dr. Burtis said she had

24    never seen it used.  She certainly has read my expert report.

25    Here is a published article, Your Honor, by Werden and Froeb of

1   the Department of Justice in the context of a merger review.

2   And in a merger, the merging parties always like to claim that

3   there are going to be some cost savings that come about from

4   allowing the two firms to merge.  And in a typical merger

5   analysis, the economists debate whether the price effect from

6   those cost savings can negate the loss in competition by

7   allowing two rivals to merge.  And whoever wins that battle is

8   going to have the net -- whether it's going to be a net price

9   savings for consumers --

10                  (Court reporter clarifies.)

11       **DR. SINGER:**  So the merger opponents are going to claim

12  that the anticompetitive effects dominate, and the merger

13  proponents are going to argue that the cost savings dominate.

14  But that's the battle.

15       And in those battles, in those merger battles -- which I

16  don't partake in because my practice tends to take me into

17  monopolization, which is why I answered the question as I did

18  in my deposition.  In those merger battles, the logit model is

19  commonly used to map a change in the merging parties' costs

20  that come about from merger synergies into a change in price.

21       If you think about it, it's precisely what I'm trying to

22  do here.  I need a model that would allow me to map a change in

23  cost that come about from a lower take rate into a change in

24  the app developer's pricing.

25       Now, let me move now to --

```
 1        THE COURT:  So you're saying there's no off-the-shelf

 2   model that fits this?  You had to come up with this yourself?

 3        DR. SINGER:  No, Your Honor.  Respectfully, that's not

 4   what I'm saying.  Let me just try to -- can I put it in my --

 5        THE COURT:  You don't have to be respectful.

 6        DR. SINGER:  I want to be.

 7        THE COURT:  You know better than I do.  So you're --

 8        DR. SINGER:  We have one --

 9        THE COURT:  -- saying --

10        DR. SINGER:  -- of two paths.

11      (Simultaneous speaking; court reporter interrupts.)

12        THE COURT:  One at a time.  I get to go first.

13        Your colleague here says that she's never seen anything

14   like this before.  And what I hear you saying is:  Okay.  I

15   adapted something from the merger context.

16        There must be some tool that economists use that doesn't

17   require you to lean into a wholly different sector.

18        DR. SINGER:  It's not exclusively used in the merger

19   context.  I'm just using this as an example of how it has been

20   used in the merger context.

21        What I'm telling Your Honor is that we have one of two

22   ways to get to the finish line here.  One would be the way that

23   Dr. Burtis and I have seen in monopolization cases before,

24   where you take advantage of variation in the wholesale rates

25   and you see whether or not the retailers pass along those
```

1    changes in the forms of prices.  We do a regression.  You've

2    probably seen it yourself.  Changes in prices at the retail

3    changes wholesale.

4        Okay.  Given that there is almost no variation in the take

5    rate here -- right?  92.4 percent of all transactions over the

6    class period occurred at that 30 percent headline rate -- we

7    can't use the standard tool; but fortunately, economists have

8    derived other pathways to try to figure out, to try to estimate

9    the pass-through rate.

10       And there, you need to describe the demand faced by the

11   developer because if you know they're facing a linear demand

12   curve or a logit demand curve or an AIDS -- there are all sorts

13   of demand specifications -- you can make a prediction about

14   what the pass-through rate would be.

15       And that's what I've done here.

16       **THE COURT:**  Why are you two so wildly different on that?

17       **DR. SINGER:**  Why are they -- I imagine that Dr. Burtis and

18   I both probably spend most of our time in monopolization cases,

19   typical price-fixing conspiracies where we get to see

20   variations in wholesale rates.  And so the kind of analysis

21   that we typically employ or I would employ as the plaintiff's

22   expert, and she would rebut as the defendant's expert, would be

23   one of these simple regressions of change on wholesale rate,

24   change on retail rate.  That's probably why we both see the

25   world the way that we do.

1     But what I would submit is that the logit model does get

2     used in antitrust settings to try to come up with a mapping --

3     **THE COURT:**  That's fine.  Why are you two so wildly

4     different?  She's at 2 percent and you're at 99.

5     **DR. SINGER:**  Oh, that's because her experiments are

6     botched, Your Honor.  And we're going to get to 2(d).

7     **THE COURT:**  We're going to jump around because we're

8     getting on in time.

9     Just tell me why her 2 percent number is not right.

10    **DR. SINGER:**  Okay.  So, for example, we'll go to her

11    subscription products.  Okay?  So I'm moving into 2(d), if

12    that's okay.  We're going to go to her subscription products.

13    She wants to exploit a change in the subscription take

14    rate in Year 2 of the subscription.  Remember, it went from 30

15    to 15 percent.  And she wants to go looking for a change in the

16    app's price for those subscription products.  But Google threw

17    up an impediment to changing the price.

18    Can I go to Slide --

19    I'm in 2(d) now.  It's just going to take me one second,

20    Your Honor, to tell you the slide number.

21    This is the testimony from --

22    Try Slide 12, please.

23    I'm jumping now to 2(d), Your Honor.  Just one second.

24    I'm sorry.  Slide 13.

25    This is deposition testimony, Your Honor, from an app

1  developer who is saying that Google didn't provide the

2  mechanics to lower the price of the subscription service in

3  Year 2 without also altering the price in Year 1.  Okay?

4      And so there are other reasons besides this impediment

5  thrown up by Google.  Let me tell you the second reason.

6  All right?

7      There was no economic incentive for a developer of a --

8      **THE COURT:**  You're saying that you think there's evidence

9  that after this 15 percent rate went into effect, the

10  developers could not pass that on?

11     **DR. SINGER:**  Correct.  They couldn't pass it on without

12  changing the first-year subscription price for the subscription

13  products.

14     **THE COURT:**  Can't do it; right?  Just, as a practical

15  matter, you can't do that?

16     **DR. SINGER:**  They just couldn't do it.

17     And so she's out looking for changes in that second year

18  subscription because she's focusing on the SKU, and she can't

19  find the changes.  And I'm telling you it's a rigged experiment

20  because the app developers couldn't lower their prices.

21     **THE COURT:**  Pause on that.

22     So, Dr. Burtis?

23     **DR. BURTIS:**  Oh, yes.  Thank you.

24     So I want to --

25     **THE COURT:**  So Dr. Singer is saying --

1    **DR. BURTIS:**  Okay.

2    **THE COURT:**  -- you looked --

3    **DR. BURTIS:**  Got it.

4    **THE COURT:**  -- looked in the wrong area, yeah.

5    **DR. BURTIS:**  Okay.  So he's focusing on subscriptions.

6    Okay?  His -- right now he's talking about subscriptions.

7    You can go to Slide 15, and you can see that the same

8    result exists for IAPs.  And this has nothing to do with

9    subscriptions.  These are the results for the one-month

10   comparison, the six-month comparison, and the life of the SKU.

11   And, by the way, Your Honor, when I did the subscription

12   experiment, I said:  I want to know -- I'm only going to put

13   this subscription in my analysis if that SKU's rate overall --

14   right? -- one year -- the SKU doesn't depend on the -- on how

15   long the subscription is.  I want -- I want the rate to go from

16   30 to at least 20.  So that developer had a 20 percent,

17   you know -- I'm sorry.  He was paying a 20 percent rate instead

18   of a 30 percent rate.  And yet the subscription numbers still

19   are what they are.

20   So Dr. Singer is saying they couldn't lower price because

21   they would have to -- the thing is, what happened with those

22   guys in my sample, all of their subscriptions were more than a

23   year old -- or not all of them, but a large number of them.  So

24   they could have lowered their price if they chose to.

25   **DR. SINGER:**  That's not -- that's just not true.

1      **DR. BURTIS:**  But --

2      **DR. SINGER:**  I'm sorry.  That's not a true statement.

3      **DR. BURTIS:**  But even so, Your Honor, it doesn't matter.

4  I mean, most of my SKUs are IAPs, and you can see that the same

5  result holds for the IAPs.  The same result holds for the paid

6  apps.  This is -- it's not just -- this is not being explained

7  by the inability to change your price.  These developers are

8  simply not responding to the service fee rate reduction.

9      **THE COURT:**  All right.  Let's not -- I don't -- we're not

10 going to debate the evidence.

11     So what about IAP and the apps?

12     **DR. SINGER:**  No, she got those wrong too.  Everything is

13 wrong.  Every experiment that she conducts is wrong.

14     **THE COURT:**  Why is that true for those two?

15     **DR. SINGER:**  Okay.  So I just want to -- before we leave

16 subscriptions, I didn't hear an answer to whether a developer

17 had the ability to lower the price in the second year of the

18 subscription.

19     **THE COURT:**  We're going to pass over that.

20     **DR. SINGER:**  Okay.

21     **THE COURT:**  Just tell me why the other two were not good,

22 in your view.

23     **DR. SINGER:**  Two reasons, Your Honor.  One is that she

24 looks at too narrow of a window.  Her windows are one month

25 before and one month after the price change.  What we are

1  trying to --

2  **THE COURT:** Well, I think she did one month; then she did

3  six months --

4  **DR. SINGER:** I'm going tell you all of them.

5  **THE COURT:** Right.

6  **DR. SINGER:** She looks at one month before, one month

7  after; six months before, six months after.  Then she

8  introduces a new slide that says "Life of the SKU."  We dug

9  into that a bit.  It wasn't much longer.  It ranged between

10  four months and eight months.

11      And the bottom-line takeaway, Your Honor, is we are trying

12  to model a but-for world in which the take rate was permanently

13  lower from the inception of the Play Store.  Right?  We're not

14  trying to model a but-for world where you go eight years and

15  then all of a sudden in one month, the take rate gets down.

16  Prices, of course, are sticky.  And you wouldn't expect a

17  developer to make an adjustment after one month.  You probably

18  wouldn't expect a developer to make an adjustment on six

19  months.  It's just too short of a time frame for the SKUs that

20  are affected to impact and work their way into the financials

21  so as to induce the developer to go back and look at its price.

22      Can I pull up, please -- let me see if I can get, on this

23  point, Slide 14.

24      Her analysis, secondly, it's completely contaminated by

25  looking only at SKUs.  Right?  And when you look at SKUs, you

1  miss the forest for the trees.  You miss the total revenues

2  that are affected.

3      So if Google makes a take rate change and it only applies

4  to the SKU -- right? -- if the SKU -- this is like -- you can

5  think of a SKU at, like, a supermarket.  It's the code.  If the

6  SKU accounts for too small of a portion of the developer's

7  revenues -- right? -- then the developer isn't going to go back

8  and reprice its product for the entirety of the product at

9  issue.

10     And here, in this example, Your Honor, it's my Slide 14,

11 it shows you again for subscription developers that the SKUs

12 that were affected -- Dr. Burtis, I think, misspoke when she

13 said the vast majority of the revenues were from that second

14 year -- the SKUs that were affected accounted for less than

15 5 percent of those developers' revenues.  So why would you

16 expect a developer to go back and revisit its pricing when this

17 effect -- when this take rate reduction touched such a small

18 percentage of the app developer's revenues at issue?

19     Can I -- is it okay if I can also go to --

20     **THE COURT:**  Well, let's hear the answer.

21     **DR. BURTIS:**  Okay.  Let's start at Slide 16.

22     So this is an example which has been anonymized that is in

23 the data, and you can see that the service fee dropped from

24 30 to 15 around sometime in 2017, Your Honor.  And you can see

25 that this price did not change all the way through 2021.

1  **THE COURT:**  Well --

2  **DR. SINGER:**  Can I respond to that one?

3  **THE COURT:**  I'm perfectly fine that you found one example.

4  **DR. BURTIS:**  Oh.

5  **DR. SINGER:**  She didn't find --

6  **THE COURT:**  But my --

7  **DR. SINGER:**  She didn't find one.

8  **THE COURT:**  Hold on.

9  The issue is, is this so pervasive that it would be

10  impossible to translate Dr. Singer's work across a class?

11  Now, we visited this issue several times.  There are going

12  to be countless variations here and there.  The issue is:  Does

13  it matter?  And for me, that means for Rule 23 purposes, does

14  that mean that common issues are going to be subsumed -- or

15  "overwhelmed" is a better word -- common issues will be

16  overwhelmed by individualized inquiries?

17  And, okay.  You found one, and I --

18  **DR. BURTIS:**  Oh.

19  **THE COURT:**  I mean --

20  **DR. BURTIS:**  No, no, no.

21  **THE COURT:**  But this would be -- you said this was an

22  anonymized example of one app developer.  But --

23  **DR. BURTIS:**  The only reason I'm showing you this example,

24  Your Honor -- and there are a few more line graphs like this in

25  my report.  The only reason I'm showing you this is that

 1     Dr. Singer's representation that it was only four to six months

 2     or six to eight months, or whatever he said, is actually not

 3     true.  There are some --

 4          **THE COURT:**  Oh, I see.

 5          **DR. BURTIS:**  -- apps in here or some SKUs in here that

 6     have quite a long life.

 7          **THE COURT:**  All right.

 8          **DR. BURTIS:**  And for those, it would not be true.

 9     But I do want to say --

10          **DR. SINGER:**  Can I respond to this slide first?

11          **DR. BURTIS:**  No.  Can I just --

12          **THE COURT:**  Just one second.

13          **DR. BURTIS:**  -- make this point?

14     Because it's an interesting point that he's making here

15     about, well, it took longer than six to eight months.

16     So, Your Honor, do you know what that means?  That means

17     that those consumers who bought over that six to eight

18     months -- right? -- are different than the ones who bought

19     later.  So now what he's saying is, we have to know how long it

20     would take.  We know that the price reduction -- we know there

21     was no price reduction.  Right?  But let's say it took six to

22     eight months.  Well, the ones that bought in that pre-period

23     are not impacted.  So, you know, yeah, it's another --

24          **DR. SINGER:**  May I respond?

25          **DR. BURTIS:**  -- individualized problem with this whole

1    pass-through analysis.

2         **DR. SINGER:**  Can I respond?

3         **THE COURT:**  Please.  Yes.

4         **DR. SINGER:**  I just want to make sure.  She didn't want to

5    use the name of the developer.  Would you like me to suppress

6    the name of the developer here as well?

7         **THE COURT:**  It's okay.  You can use the name, if you'd

8    like.

9         **DR. SINGER:**  Okay.  It's iHeartRadio.  And this is

10   really important.  Okay?

11        Well, because you made a mistake in the graph.  All right?

12   It happens.

13        But if you could flip back and forth, please, between

14   Exhibit -- this slide and the following slide, you're going to

15   show that Dr. Burtis stumbled on two different prices in the

16   data set for iHeartRadio.

17        I'm going to move over here, Your Honor.  Are you going to

18   be able to hear me if I move over, or should I just stay put?

19   I'll stay put.

20        **THE COURT:**  Just stay there.

21        **DR. SINGER:**  If you look at the iHeartRadio on Exhibit 17,

22   you'll see it at 4.99.  4.99.  Now, if we could flip back,

23   please, to the prior slide, you'll see it at 5.99.  How could

24   this happen?  Right?

25        It happened because Dr. Burtis is so singularly fixated

with a SKU analysis, she missed the fact that iHeartRadio

introduced a lower price at 4.99 in response to Google dropping

its take rate in July of 2017 from 30 to 15 percent.  This was

a special deal that they calculated -- that they struck.

And in response to the deal, if I could show Your Honor, I

went back -- when I saw this discrepancy when we got the

exhibits, we went back into the database --

**THE COURT:**  Let me just make sure I understand.

**DR. SINGER:**  -- and we calculated --

**THE COURT:**  Hold on.

**DR. SINGER:**  Excuse me.

**THE COURT:**  Let me make sure I understand.  So you're

saying on page 16, this is iHeartRadio.  On page 16, she has it

priced at 5.99.

**DR. SINGER:**  Yes.

**THE COURT:**  And that predates -- that's the pre-15 percent

reduction price.

You found that after the 15 percent was implemented by

Google, they actually dropped their price to 4.99?

**DR. SINGER:**  Let me tell you exactly what I found.  Both

prices exist in the database, but iHeartRadio started selling

the 4.99 on the Google Play Store app as opposed to the

4.99 [sic].  Here's how I know.

As soon as I saw the discrepancy of 4.99 to 5.99, I went

into the sales data, the transaction data; and I took a

1  weighted average of what iHeartRadio was making for the

2  product iHeart Plus -- right? -- which contains multiple

3  SKUs.

4     The reason why she missed it is because all of her

5  analyses are SKU focused and this contaminates everything that

6  she does.  She's missing the forest for the tree.

7     May I draw what happened?

8     **THE COURT:**  This is endemic to her analysis.

9     **DR. SINGER:**  Endemic to her analysis.

10    May I draw what happened, Your Honor, after December 2017

11 on --

12    **THE COURT:**  Sure.  Yes.

13    **DR. SINGER:**  So the weighted average starts falling from

14 5.99 to 4.99, and it asymptotes -- which is a fancy word --

15                (Court reporter clarifies.)

16    **DR. SINGER:**  I'm sorry.  I got so excited about this

17 example.

18    It asymptotes at 4.99.  It's a fancy word for it

19 approaches and then it basically hovers at 4.99.

20    So what I've done, Your Honor, I've drawn this on for you.

21 And if I could just introduce it.  May I just pass it up to

22 you?  Is that okay?

23    **THE COURT:**  Sure.  Hand it to the CRD.

24                (Document handed up to the Court.)

25    **THE COURT:**  Thank you.  Okay.

 1      **DR. SINGER:**  And so this is the takeaway, Your Honor, from

 2  this whole exercise.  I assert that with the exception of five

 3  cherry-picked examples, all of Dr. Burtis's analyses focus on

 4  too narrow of a window:  one month or six months and then

 5  she's done this life of the SKU, which is four to eight months.

 6      She comes back with five cherry-picked examples, which, by

 7  the way, shouldn't surprise you in a database of hundreds of

 8  thousands of apps and millions of transactions that she can

 9  find five.  But even on her favorite, the iHeartRadio, it

10  actually shows example of pass-through.

11      Can I show you how it performs relative to the --

12      **THE COURT:**  Very quickly.  This is a little more granular

13  than I actually find useful.  Just round it out.  Then I want

14  to ask my next big question.

15      **DR. SINGER:**  May I go --

16      **THE COURT:**  Sure.

17      **DR. SINGER:**  Can I go to the flip chart?

18      **THE COURT:**  Yeah.  Use the whiteboard.

19      **DR. SINGER:**  So the question is:  What does the logit

20  model predict for iHeartRadio when it realizes a reduction in

21  the take rate from 30 to 15 percent?  Let me show you exactly

22  what the logit model predicts.

23      The logit model says, start with the original price of

24  5.99 -- right? -- and subtract one minus the developer's share

25  within the category.

1     We didn't get to talk about these, but Google picked the

2     categories by design, and then app developers select into that

3     category in a way to position themselves in the marketplace.

4     All right?

5     I calculate that iHeartRadio's share within the category

6     is 7 percent.  So the logit model would predict that its

7     pass-through would be one minus 7 percent.  Right?  And it

8     saved 15 percentage points on that original price of 5.99.

9     That's what the logit model would predict.  And if you grind

10    through the math, you get a predicted price of $5.15.  That's

11    what the logit would predict.  Right?  In the real world, they

12    dropped their price to $4.99 -- right? -- which is off by 16

13    cents.  Right?

14    But this is her favorite example.  And her favorite

15    example confirms the predictive power of the logit here.

16    **DR. BURTIS:**  May I respond?

17    **THE COURT:**  Please.

18    **DR. BURTIS:**  Okay.

19    **THE COURT:**  Then we're going to move on.  But go ahead,

20 yeah.

21    **DR. BURTIS:**  So -- so the graph on my Slide 16, there are

22 people who are buying at 5.99.  So those people who

23 purchased -- this isn't a made-up line.  There are transactions

24 that occur at 5.99.  So --

25    **DR. SINGER:**  Yeah.

         **DR. BURTIS:**  I'm sorry.

         Dr. Singer's claim here is that in over 450,000 of these
SKUs, you know, all of these developers, even if they only had
one SKU, introduced another SKU, and then somehow there was a
weighted average that explains everything.  So I -- he did
not -- he certainly did not make that claim in his report, in
his reply report, Your Honor.  You know, he did not show -- he
certainly did not establish that.

         The last thing I do want to say is, going back to his
formula, the one minus the share formula is wrong.  Okay?  If
he wanted -- if he's trying to prove something with his
formula, he needs to use the formula that actually works.  Even
with the logit model, it has a service fee rate.  And it is not
that formula.

         So, and we can go through and I can explain to you why
that is, but that is the wrong formula.

         **THE COURT:**  All right.  I think that's covered enough on
your part.

         Here's how I want to close this out.  I am tentatively,
more or less, comfortable with the service -- the developers
side of the platform, two-sided platform, all right, in terms
of calculating a but-for rate.

         What is much less clear to me, Dr. Singer, is why a
developer would have passed through to the consumer any savings
that would have been the result of a reduced rate charged by

```
 1  Google and, more importantly, how you would establish that on a
 2  class-wide basis.
 3       DR. SINGER:  Sure.  So let me break that -- it's a
 4  two-parter.
 5       So why would you do it?  Why would you do it is that
 6  you're competing against everyone within the category.  Right?
 7  And if you're similarly --
 8       THE COURT:  Are you really?  I mean, one of the charms of
 9  games is that there are killer games, that only that one game
10  will do and people love it and it's a unique product, and
11  that's why they make billions of dollars after their initial
12  development costs, because they're not substituting in some
13  other game.  Someone who wants to play Fortnite is not
14  necessarily playing Madden NFL.  So they're unique.  They
15  strike me as much more --
16       DR. SINGER:  Yes.
17       THE COURT:  -- unique.
18       DR. SINGER:  And the logit model allows for some product
19  differentiation, exactly what you said.  That is, they're not
20  perfect substitutes.  These games with --
21       THE COURT:  My point is, though -- let me just jump in, in
22  the interest of time -- if you have a game that everyone loves
23  and there's no substitute for it, why ever would you pass any
24  cost reduction on to your consumers?
25       DR. SINGER:  That's a great --
```

 1          **THE COURT:**  Why wouldn't you just add the 30 percent to

 2     your own account?

 3          **DR. SINGER:**  It's a great question.  And the logit model

 4     predicts that if you so dominate your category, the way that

 5     you suggest -- remember, I did a second cut in my reply report

 6     by subcategories.  So if your game so dominates the category

 7     such that its share is close to a hundred percent, the logit

 8     model would predict that you wouldn't pass through any of the

 9     savings.  Right?

10          If you were at 95 percent within your category -- for

11     example, Pandora is at 75 percent within the music category.

12     So the logit model predicts that Pandora would only pass

13     through 25 percent of a savings from a take rate reduction,

14     which should be very intuitive.

15          In a -- we use the word "atomistic."  But a very small

16     firm that lacks market power prices, according to economic

17     theory, at marginal cost, and so it passes through 100 percent

18     of any cost change.  Just as the logit model would predict if

19     your share was zero, you would pass through a hundred; but as

20     you gain market power --

21          **THE COURT:**  This is where I'm not seeing why class-wide

22     treatment makes sense when there's this variation in the

23     pass-on rate.

24          **DR. SINGER:**  Okay.

25          **THE COURT:**  You have a heavyweight, you think -- I'm just

1    talking among friends here; so nothing is carved in stone.

2         Every category is going to have a heavyweight or two.  The

3    market leaders, so to speak.  Everybody wants to go to Spotify.

4    Everybody wants to go to whatever the food and wine site is.

5    Okay?  And then there are going to be a number of people trying

6    to catch up.

7         So I just -- I'm not -- how do you come up with a single

8    uniform figure that would be the basis of consumers' antitrust

9    injury?

10        **DR. SINGER:**  I allow for, Your Honor -- remember in my

11   Table 14, I compute aggregate damages for each category

12   separately.  Right?  So I'm allowing for variation in

13   pass-through rates.  When I -- I first solve for the change in

14   the take rate, and then I apply the category-specific

15   pass-through rate.

16        So to use your example in music, where music is dominated

17   by Pandora with a 75 percent market share, the average

18   pass-through rate in the music category, you'll see on that

19   table, is around 40 percent.  Now, we know from what we talked

20   about earlier that the average across all categories was

21   89.9 percent.

22        So I'm allowing for the possibility that for those

23   categories or subcategories that are dominated by a single

24   developer or maybe two developers, the pass-through rate will

25   be lower.

1      But what I'm offering is a common methodology that will

2  give you the predicted pass-through rate for all developers.

3      **THE COURT:**  Well, just pause for a moment.

4      **DR. SINGER:**  Sure.

5      **THE COURT:**  Just tell me how that -- what the methodology

6  is that allows you to reliably and accurately predict, just for

7  lack of a better word, that developers' greed is not going to

8  get in the way.

9      In other words, how do you know someone's not going to

10  say, "This is fantastic.  Google has gouged me 30 percent.  Now

11  they're only gouging me 15.  That other 15 is going right in my

12  account"?

13      **DR. SINGER:**  I think the question, as I'm internalizing

14  it, is:  How do you know that the logit model is reliable to

15  make predictions in the but-for world here?  That's how I'm

16  internalizing it.  Is that okay?

17      **THE COURT:**  That's fine.

18      **DR. SINGER:**  All right.  And you don't know until you test

19  it.  And so the very first thing that I did was I gathered all

20  the data and I ran separate regressions by category.

21      And the logit model makes a very specific prediction about

22  the relationship between an app's share within its category and

23  its price; and, in particular, the prediction is that as the

24  app's price goes up, it should lose share within the category,

25  reflecting the fact that all of these apps within the category

1   are substitutes in some way, in some way.

2       And I estimated this model for every category, and I found

3   a very tight fit.  What I mean by that is that the coefficient

4   that related an app developer's price with an app developer's

5   share was negative and statistically significant at the highest

6   levels of statistical significance, the 1 percent level.  And

7   the R-squared was over 86 percent.  That is, the model -- the

8   logit model was explaining 86 percent of the variation in an

9   app's share within the category.

10      **THE COURT:**  But 86 percent is a little low, isn't it?

11      **DR. SINGER:**  Now, in terms of R-squared, Your Honor, it's

12  actually pretty high in terms of published work in R-squared.

13      But the real statistic of the two that matters is the

14  p-value on those price parameters.  What I found was that for

15  34 of the 35 categories, transportation is an outlier.  It was

16  a category that Google actually removed in 2016.  But

17  transactions -- a few scant transactions remained, so I left it

18  in as a category.

19      For 34 out of 35, the data obeyed the prediction of the

20  logit model.  Right?  I couldn't have used the logit model's

21  implied pass-through rate of one minus the developer's share

22  unless I tested and confirmed for myself --

23      **THE COURT:**  You think there's a single number that can be

24  used for all of the consumer transactions?

25      **DR. SINGER:**  I don't.  I don't, Your Honor.

1    I used the 89.9 to plug into the Rochet-Tirole model --

2  and this is an important caveat -- when I'm solving for a

3  but-for take rate.

4    When I do the Play Points model, we get to consumer injury

5  without recourse to a pass-through rate.  Pass-through is not

6  necessary for the Play Points model.  That's that second

7  iteration of Rochet-Tirole.

8    But when we go down the take rate path, we need to plug in

9  the average pass-through rate so that we can get a singular

10  but-for headline rate.  Right?  But then once we know what the

11  but-for take rate, the headline rate is, we allow the take rate

12  to vary by category, and we allow the pass-through rate to vary

13  by category based on how individual apps dominate, you know,

14  the shares within the category so that we can arrive -- this is

15  Tables 13 and 14 that we looked at earlier -- so that we can

16  arrive at a category-specific damages, which is a pot of

17  savings that come off the actual savings.

18    **THE COURT:**  By app category?

19    **DR. SINGER:**  By each of the 35 categories.

20    Dr. Burtis got upset when I lumped the games together.

21  And so even though the parameter and the games model was highly

22  statistically significant and negative, I went back and I used

23  Google's designated subcategories for games.

24    **THE COURT:**  Let me ask you this.

25    **DR. SINGER:**  Yes.

 1          **THE COURT:** I'm not on any of these devices. So I think I

 2     understand how this works, but just give me a break if I get it

 3     wrong.

 4          But I'm on Google Play. I have an Android phone. I'm on

 5     Google Play. I buy one app, one app, and it's a sports app.

 6     It helps me keep track of my swimming workout. Okay? And it

 7     costs me -- it's 4.99 a month. That's it. That's all I have.

 8          What check am I going to get?

 9          **DR. SINGER:** Can we look at Table 14? I'll tell you

10     exactly.

11          **THE COURT:** Sure. Yeah. Just tell me mechanically. I'm

12     not so interested in the number, but how you're going to derive

13     that.

14          So Table 14. Okay.

15          **DR. SINGER:** Oh, yes. I'm going to have to look at my

16     report.

17          **THE COURT:** Is it Table 13?

18          **DR. SINGER:** No. I think 13, Your Honor, is for the

19     initial market, the Android app distribution market; but in

20     your hypothetical, I take it there was no price to download the

21     app in the first instance. So we're in in-app.

22          **THE COURT:** It's just a monthly fee.

23          **DR. SINGER:** Right. Right, right, right. Okay. So let's

24     look at Table 14.

25          Do you happen to have the page number in front -- oh, I

1   got it.

2       **THE COURT:** 134.

3       **DR. SINGER:** Okay. All right.

4       All right. So we have a consumer who made one purchase

5   within the sports category; right?

6       **THE COURT:** Yes.

7       **DR. SINGER:** And so what we do is we say that for every

8   $10 of expenditure that that consumer made during the class

9   period, we can figure out that they were overcharged on the

10  order of 9.9 percent.

11      And we get there by comparing the actual take rate to the

12  but-for take rate within the category. Right? That was from

13  the Landes-Posner model.

14      And then we look at what the pass-through rate is for

15  sports. You'll notice, Your Honor, it's at 81 percent. That's

16  lower than the typical category, and that's because there's a

17  few guys in there who really dominate the category. Right?

18      **THE COURT:** That number is a product of the logit formula;

19  right?

20      **DR. SINGER:** Correct. Correct.

21      **THE COURT:** Okay. All right.

22      **DR. SINGER:** And you'll see what their but-for expenditure

23  would have been for every $10 they spent, and the savings is

24  99 cents, and so that would mean a 9.9 percent.

25      That means that if a consumer class member stepped forward

1  and said that they had spent a hundred dollars, we could figure

2  out precisely what their overcharge was.

3      **THE COURT:**  All right.  So the method is the same,

4  regardless of the app category.  It's going to have different

5  numbers within each app category, but the method is uniform for

6  all the app categories.

7      **DR. SINGER:**  Of course.  And there's one last point, as I

8  pointed out in my report.  Then I'll turn over the mic, I

9  promise.

10      I could do this at an app-by-app level as well, but the

11  table that I would have presented to you would have gone on

12  for -- yes.  But mechanically, it's just writing code in the

13  computer.  We could allow for these percentage overcharges to

14  vary by app.  But what I've offered is a reliable and common

15  methodology that could apply to every member of the class.

16      **THE COURT:**  All right.  Now, just at the methodology

17  level, Dr. Burtis --

18      **DR. BURTIS:**  Yes.

19      **THE COURT:**  -- not the inputs and outputs, but the macro

20  level --

21      **DR. BURTIS:**  Yes.  I do want to say one --

22      **THE COURT:**  -- what's wrong with this?

23      **DR. BURTIS:**  Well, there's a couple of things.

24      I do want to go back.  This is a -- this is directly

25  related to the methodology and Dr. Singer's claim regarding the

1  use of the logit model in mergers and his claim that that

2  article --

3      **THE COURT:**  I would love to hear that, but I've got to

4  tell you something.  It's 4:10.  I'm getting tired.

5      **DR. BURTIS:**  Okay.

6      **THE COURT:**  Just help me with the first part.

7      **DR. BURTIS:**  Okay.

8      **THE COURT:**  What's wrong -- I mean, okay.  I know you

9  disagree with the inputs and the outputs, but the method --

10     **DR. BURTIS:**  The method is wrong.

11     **THE COURT:**  -- doesn't sound wrong.

12     What's wrong?

13     **DR. BURTIS:**  Your Honor, the method is wrong.  Okay?  And

14  so the method is wrong because the formula is wrong.  The

15  formula does not take account of the service fee rate being a

16  function of price.  And this is -- you won't want to hear all

17  this, but if he had done -- if the authors of that article that

18  he used for that formula had done -- had asked the question

19  "What is the pass-through rate for a service fee rate?" --

20  right? -- if you had a cost that depends on the price of the

21  product, what would the formula be?  The formula would be

22  different.  Okay?  So the formula is wrong.

23     Okay.  Two, the right formula depends on something that

24  Dr. Singer has not estimated.  It depends on the marginal cost

25  of the developer.

```
 1         And I'm not talking about the marginal cost being the
 2   service fee rate.  I am talking about the other marginal costs.
 3         This is in Dr. Singer's report.  There's a formula for
 4   C-star.  It's in paragraph 225 of his report.  C-star should
 5   have been what was considered in the pass-through rate.  It was
 6   not in that article.  Okay?
 7         So the formula is wrong.  I just want to keep making that
 8   point.
 9      DR. SINGER:  May I respond?
10      DR. BURTIS:  No, not yet.
11      DR. SINGER:  Okay.
12                    (Laughter.)
13      DR. BURTIS:  Okay.  So, second point, and you are cueing
14   into an important point when you're asking your question about
15   the big developer who has a -- is really important in the
16   category.  Okay?  Even if you don't believe that the formula is
17   wrong, Dr. Singer's implementation of this formula, of his
18   formula, is wrong because, remember, the logit -- the whole
19   logit demand system works off of shares.  Okay?  Shares are
20   super important in that.  The dependent variable is a share.
21   It is not the quantity, like we usually think of in demand.
22         And a fundamental requirement of that logit model is that
23   all of the products in that share have to be substitutes.  I'm
24   not saying they have to be in the same relevant market.  I'm
25   not saying that.  They have to be substitutes, though.  And
```

1    they are not.  Dr. Singer acknowledged they are not.

2        I have two examples --

3        **THE COURT:**  Well, let me ask you, though.  These are

4    Google categories.

5        **DR. BURTIS:**  They are Google --

6        **THE COURT:**  Google is grouping all of these apps into the

7    category.

8        **DR. BURTIS:**  No, actually.  Google is not grouping them.

9    Google identifies a set of categories, and then the developer

10   selects the category that they want to go into.

11       **THE COURT:**  So they self-select.  But the menu -- Google

12   gives you 35 choices, or whatever, and says:  You pick.

13       **DR. BURTIS:**  Yes.

14       **THE COURT:**  That's fine.  But, okay.  So I understand the

15   interchangeability for share, but this is the way Google does

16   its business.  So Dr. Singer can only work with what Google

17   actually does.

18       And I don't see why calling it a share, quote/unquote,

19   within a Google-designated category structure is a problem.

20       **DR. BURTIS:**  So it was Dr. Singer's choice to use logit.

21       **THE COURT:**  I understand.

22       **DR. BURTIS:**  You know, he picked that model.  And so if he

23   picks that model, then whatever Google does and whatever the

24   categories there are, he is required to figure out what

25   products are substitutes.  He can't use the Google categories

1  if they're not substitutes.

2      And I have two slides, 9 and 10.

3      **THE COURT:**  Let me just go back to the sports apps because

4  those are the only ones I know.  I don't run.  I swim.

5      **DR. BURTIS:**  Right.

6      **THE COURT:**  Okay?  So I'm never going to use a running

7  app.

8      **DR. BURTIS:**  Perfect.

9      **THE COURT:**  So how does that play out?

10     **DR. BURTIS:**  They are not substitutes.

11     **THE COURT:**  Okay.

12     **DR. BURTIS:**  Or -- I mean, that one --

13     **THE COURT:**  Dr. Singer would treat them as part of the

14 same --

15     **DR. BURTIS:**  Yes.  And that one, I mean, maybe there's

16 some little ambiguity, Your Honor.  But, you know, is Thomas

17 the Tank Engine a substitute for Doom, you know, this violent

18 game?  We hope not.  We hope that parents are more vigilant.

19     The other slide I have --

20     **THE COURT:**  Just, I want to hear more.  So what?  What

21 does that --

22     **DR. BURTIS:**  Yes.  So --

23     **THE COURT:**  -- lead you to conclude?

24     **DR. BURTIS:**  Thank you.  Yes.

25     So what he should have done, if he wanted to use the logit

1  model -- it was his choice.  He wanted to use it.  So if you're

2  going to use it, do it right.  Figure out the groupings of

3  products that are truly substitutes for one another.

4      You don't -- you don't estimate a games logit.  You might

5  estimate -- you know, I don't know how many -- 10, 12, 20

6  different games logit equations, all of which have products

7  that are substitutes.

8      **THE COURT:**  Well, now let me ask you.  Let's say that's

9  true, and let's say the top number, whatever, is now 20.  How

10 does that affect the output for that equation?

11     **DR. BURTIS:**  Well, first of all, that whole exercise is a

12 complicated and individualized analysis, because now you're

13 going app by app and you're trying to figure out which category

14 does this app go in.  Is there a category I need to construct

15 with a certain set of apps?  That, in and of itself, is a very

16 individualized analysis.

17     **DR. SINGER:**  Is it okay if I respond?

18     **THE COURT:**  Go ahead.

19     **DR. BURTIS:**  Okay.  So the other thing that I --

20     **THE COURT:**  Okay.  So then what does that do to the

21 number?  So how does that make the number -- if you did it that

22 way, how would that make the number -- would it make it bigger?

23 Would it make it smaller?  What would the impact on the number

24 be?

25     **DR. BURTIS:**  So what I would tell you is, first of all,

1    you'd have a lot more numbers.  Right?

2         And, by the way, all of this is not really addressing your

3    question about the dominant app because they're all averages

4    over these categories or subcategories.  Okay?

5         But we still -- we still haven't solved a major problem

6    with this formula.  Now we have all these logit equations.

7    Right?  But now we need the right formula.  And in order to get

8    the right formula, now we are on another individualized

9    analysis.  We need to go find the marginal cost of these apps

10   because if that marginal cost is zero, then the pass-through

11   rate is zero.

12        And in this industry, what does marginal --

13        **THE COURT:**  And that's by operation of the formula?

14        **DR. BURTIS:**  The right formula, Your Honor.  The right

15   formula.  Okay?

16        And let me just say one thing about this, one last thing.

17   All of what I'm telling you -- right? -- that you have to

18   consider the marginal costs of the developer; you have to have

19   the right formula and the economic literature that supports

20   that; the theoretical literature; the empirical literature --

21   all of that is consistent with my results where I go and I look

22   at all of those SKUs SKU by SKU and I say:  What happened to

23   the price?  You know, did it change when there was a service

24   fee rate reduction?

25        All of that economics is consistent with that data,

 1    because what we know about this industry -- we know two
 2    important things about this industry.  One is that the marginal
 3    costs of many of these developers are very low.  This is in the
 4    economics literature, article after article.
 5         **THE COURT:**  Isn't that kind of the issue?  I was just
 6    thinking that.  I mean, in software, typically, the marginal
 7    costs are --
 8         **DR. BURTIS:**  Yes.
 9         **THE COURT:**  -- almost always getting close to zero
10    because --
11         **DR. BURTIS:**  That is correct.
12         **THE COURT:**  -- once you make it, you just copy it.
13         **DR. BURTIS:**  Exactly.  And once you have an app and a
14    consumer is clicking on that app, buying the sword or the jewel
15    or whatever it is, there's no marginal cost to the developer.
16         **THE COURT:**  But you're saying -- you're faulting
17    Dr. Singer for not looking at marginal cost when I think a fair
18    presumption is the marginal costs are fairly low and fairly
19    standardly low.
20         **DR. BURTIS:**  Well, the marginal costs are -- I would say
21    it is typical.  It is, I think -- I don't think that we can
22    assume everybody's marginal cost is zero; and I have some
23    examples of why you can't just assume everybody's marginal cost
24    is zero.
25         But if the marginal cost is zero, the pass-through rate is

1   zero.

2       **THE COURT:**  They're going to have some cost.  It's not

3   entirely -- somebody still has to get paid to press the button

4   to copy the software, something.

5       But my point is, it seems to me a fairly standard number,

6   in the 1 percent range -- I'm just making it up -- would not be

7   an unreasonable assumption, given the nature of the software

8   industry.  And I don't know why then you fault Dr. Singer for

9   not making an individualized inquiry when it is probably not

10  entirely -- it's probably not implausible to assume that

11  there's an industrywide marginal cost number of X.

12      **DR. BURTIS:**  Well, Your Honor, if that's true, if the

13  marginal costs are very close to zero, and there's one

14  more characteristic of this business --

15      **THE COURT:**  It's not zero --

16      **DR. BURTIS:**  -- that's important --

17      **THE COURT:**  -- but it's close to zero.

18      **DR. BURTIS:**  Okay.  And the second characteristic of this

19  business -- and I think Dr. Singer agrees -- is that prices are

20  sticky.  We see 90-some percent --

21      **THE COURT:**  Don't go to prices.  Let's just --

22      **DR. BURTIS:**  This all has to --

23      **THE COURT:**  Hold on.  Stop.  Stop.

24      **DR. BURTIS:**  Okay.

25      **THE COURT:**  Finish the marginal cost point.

1    **DR. BURTIS:**  Okay.

2    **THE COURT:**  Let's just say it's 1 percent for everybody.

3    **DR. BURTIS:**  Okay.

4    **THE COURT:**  Why is that a problem?

5    **DR. BURTIS:**  So the pass-through rate is going to be

6    proportional to marginal cost.  So if the marginal cost is

7    really low like that, the pass-through rate is going to be

8    really low.  Okay?  And that's just math.  That's just math.

9    That's not thinking about, really, the particular

10   characteristics of these products.

11       Now -- and I don't know that it's 1 percent for everybody.

12   Right?  Maybe it's 10 percent.

13       **THE COURT:**  We're just talking.

14       **DR. BURTIS:**  Okay.

15       **THE COURT:**  It's just my number.

16       **DR. BURTIS:**  Right, right.

17       But now the question is -- the ultimate question is:  Is

18   this developer going to pass through that service fee rate

19   reduction?  If the marginal cost is very low like that, they

20   are going to pass -- they're going to change their price just a

21   tiny bit.  Okay?

22       But the other thing that we know about this industry is

23   that a lot of developers in the actual world use these focal

24   point prices.  Their prices are sticky.  They don't change them

25   for every little change in cost.

 1      So you put those two factors together, and now you're

 2   talking about a large percentage of these developers are not

 3   passing through the service fee rate reduction, which, again,

 4   is consistent with what I found in my -- my analysis of the

 5   actual data.

 6       **DR. SINGER:**  Your Honor, can I get a word --

 7       **DR. BURTIS:**  What that means --

 8       **DR. SINGER:**  Can I get a word in?

 9       **DR. BURTIS:**  I'm sorry.  Let me just finish.

10       **DR. SINGER:**  This is like a filibuster right now.

11       **THE COURT:**  All right.  Please, complete your --

12       **DR. BURTIS:**  The last point or the bottom line,

13   Your Honor, is that in order to know that, in order to know

14   what -- whether or not the developer is going to pass through

15   that service fee rate reduction, you've got to know what the

16   marginal cost is, and you've got to know whether the developer

17   is focal point pricing and would continue to focal point price

18   in the but-for world.

19       **THE COURT:**  And you're saying Dr. Singer did not have that

20   in the logit equation?

21       **DR. BURTIS:**  There's no marginal cost in his formula.

22   There is no adjustment for focal point pricing.

23       **THE COURT:**  All right.  Let's close it out, and then I'm

24   going to see if there are any questions.

25       **DR. SINGER:**  Okay.  That was a lot.

1          **THE COURT:**  Actually, I don't think it was.

2          **DR. SINGER:**  Well --

3          **THE COURT:**  She's faulting you for saying that your logit

4     equation --

5          **DR. SINGER:**  Yes.

6          **THE COURT:**  -- didn't include marginal cost or sticky

7     prices.

8          **DR. SINGER:**  Okay.  Let's start with the logit formulas.

9     Is it okay if I put up the exhibit of the Miller article where

10    the logit formula pass-through is derived?

11         **THE COURT:**  Which article?

12         **DR. SINGER:**  Miller, et al.

13         **THE COURT:**  You don't have to put it up.  I have it.

14         **DR. SINGER:**  Okay.  Fine.

15         I'd like to call your attention just to three equations in

16    that article.  And she also mischaracterized it to you.  So let

17    me just try to clear up a few things.

18         Can I get that up, please?

19         Do you have it in front of you, Your Honor?

20         **THE COURT:**  I do.

21         **DR. SINGER:**  Equation 1, to get the pass-through rate, you

22    need to go through a series of steps.  It actually takes three

23    steps.  The first step, Your Honor, Equation 1, is you have to

24    find out the profit-maximizing price for the firm in light of

25    the marginal cost that it's facing and the demand that it

1   faces.  That's what Equation 1 is showing you.

2       You cannot get the pass-through rate just with Equation 1.

3   You have to move to Equation 2.

4       Equation 2 tells you how the profit-maximizing price

5   changes in response to a change in the cost.  Right?  Only then

6   do you have something that approximates a pass-through.

7       So when Dr. Burtis asserted that I should have used what

8   was the Lerner index in paragraphs 224 to 225 of my report,

9   that is analogous to Equation 1 in Miller's paper.  You can't

10  do anything with Equation 1.  You have to take the derivative

11  of the profit-maximizing price with respect to a small change

12  in cost.

13      **THE COURT:**  I think this is a level of detail that's not

14  terribly helpful.

15      **DR. SINGER:**  But let me --

16      **THE COURT:**  Just tell me, why is it okay --

17      **DR. SINGER:**  But this is --

18      **THE COURT:**  -- for your logit formula to omit marginal

19  cost and --

20      **DR. SINGER:**  Right.

21      **THE COURT:**  -- sticky prices?

22      **DR. SINGER:**  It does not omit marginal costs because you

23  can see, Your Honor, in Equation 1 the marginal costs are

24  considered when solving for the profit-maximizing price.  When

25  you move to Step 2, you get the pass-through rate.  Then you

 1   have to assume a certain demand structure.  And Miller does

 2   several.

 3       But when you do the logit, if you look at the math,

 4   Your Honor, Equations 5 and 6, it's really, really complicated;

 5   but all of a sudden comes out of the pass-through rate formula

 6   a very simple equation where the pass-through rate is one minus

 7   the firm's share.

 8       Now, this is a standard pass-through model.  If you go

 9   through all of his demand systems, none of them include the

10   marginal cost in the pass-through formula.  Right?  And that's

11   a good thing.  Imagine if you couldn't use a pass-through

12   formula unless you could observe the marginal cost of a firm.

13   That's very hard to do.

14       What the Miller article is giving you is a pass-through

15   formula that makes use of a change in the marginal cost.

16       **THE COURT:**  Oh.

17       **DR. SINGER:**  And that's easy to observe.

18       **THE COURT:**  Is your one minus the share in this Miller

19   article?

20       **DR. SINGER:**  Yes, Your Honor.  It's Equation 6.

21       If you look at Equation 6 in the top, you have to do two

22   things to it -- three things, in particular.  You see the

23   equation?  Equation 2 solves for the take rate.  But it gives

24   you the take rate as a negative of the inverse.  You have to

25   first multiply by minus one, take the inverse, then divide

1    through by total units, and you will get the very simple one

2    minus share formula.  And it's the same one minus share formula

3    that Werden and Froeb use in their merger article.

4        I don't think there's any dispute as to whether or not the

5    pass-through formula from logit is one minus the share.

6    I think we can agree on that.

7        What Dr. Burtis is asserting is that it's somehow infirm

8    because it doesn't include the term "marginal cost" in the

9    pass-through.  But neither did any of the pass-through

10   formulas, whether you go the linear model -- the linear model

11   predicts a pass-through rate of 50 percent, no matter what --

12   no matter what the parameters of the demand model is.  Always,

13   always 50 percent.  It is not a function of the marginal cost.

14       I'd like to clear up one other thing too about this

15   marginal cost being zero.  I will agree -- maybe we can find

16   some happiness here -- that the cost of replicating the sword

17   is zero.  Right?  But when Google focuses on replication costs,

18   they're playing games.  That's not the full marginal cost of

19   making and selling the app.

20       I cite an article in *Management Science* 2014 by Ghose and

21   Han that lists all of the marginal costs that app developers

22   face.  Okay?  And Dr. Burtis has never addressed that article

23   in anything that she's ever said or written.

24       Moreover, an app developer faces payment processing for

25   every sale that it makes.  Again, if you focus narrowly on the

 1   replication cost, you're going to miss all these marginal costs

 2   that have been identified in the literature.

 3        So it's just wrong to assert that marginal costs are zero,

 4   as Google and Dr. Burtis make.

 5        I'd like to make --

 6        **THE COURT:**  I hear what you're saying, is that in the real

 7   world, it would never be zero?

 8        **DR. SINGER:**  It's not zero.

 9        **THE COURT:**  It's improbable.

10        **DR. SINGER:**  And the beauty of the logit model,

11   Your Honor, and the linear model and the AIDS model, you don't

12   need to recover the underlying marginal costs, which would be

13   almost impossible.  If I offered you up a pass-through formula

14   that was a function itself of the marginal cost, it would have

15   very limited applicability.  How are we ever going to go

16   observe a firm's marginal cost?  Right?  They don't record this

17   in their financials; right?

18        What we can observe is what the change in the marginal

19   cost would be in a but-for world.  If I go from 30 to

20   15 percent take rate and my app was at $10, I can figure out

21   right away what the change in the marginal cost is.

22        And a logit model gives us a way to map that change in the

23   marginal cost into a change in prices.

24        And I want to, if I could, on this meaningless of Google's

25   own categories -- is it okay if I can address that?

1          **THE COURT:**  I don't need it.

2          **DR. SINGER:**  Okay.  Good.

3          **THE COURT:**  Okay.

4          **DR. BURTIS:**  Can I just respond?  Sorry.

5          **THE COURT:**  Yes, you can have the closing word.  And then

6     I'm going to ask if there are any questions.

7          **DR. BURTIS:**  Okay.  So, first, Your Honor, I am not saying

8     that every developer has zero marginal cost.  I'm not saying

9     that.  All I'm saying is that we have to know what the marginal

10    cost is to know what the pass-through rate is.

11         This is not only in Dr. Singer's report in paragraph 225,

12    but he says those words in his deposition.  He says:  The

13    pass-through rate is proportional to the marginal cost other

14    than the processing rate.  I think that's the phrase he used,

15    "processing rate."  So he agrees with this.

16         You need to know the marginal costs.  If you have the

17    right formula, the marginal cost is in that formula.  Has

18    nothing to do with the processing costs.  Some of those costs

19    are likely to be very low, and that is going to cause a

20    developer not to reduce its price.

21         All of that is consistent -- and, by the way, the

22    Ghose and Han article, it's fine.  I agree, not all developers

23    are going to have zero marginal costs.  Some will; some will

24    not.  We need to do the analysis, the individualized analysis,

25    to figure that out.  Is it hard?  Yes.

```
 1        THE COURT:  How could any developer have a zero marginal
 2   cost?
 3        DR. BURTIS:  Oh.  I'm not saying -- I mean, it could be
 4   very, very small.  Right?  Small enough that it's not going to
 5   matter in the math to --
 6        THE COURT:  I'm asking a different question.  How could
 7   any business have a zero marginal cost?
 8        DR. BURTIS:  Okay.  So definitionally, what a marginal
 9   cost is, is the incremental cost for an incremental sale.  So
10   you have ten consumers who --
11        THE COURT:  I know what it is.
12        DR. BURTIS:  Okay.
13        THE COURT:  How could you ever have a zero marginal
14   cost --
15        DR. BURTIS:  Because --
16        THE COURT:  -- and be an ongoing business?
17        DR. BURTIS:  Okay.  I think -- it's not their total costs.
18   It's not even their variable costs.  It's their marginal costs.
19        So, for example, some of the costs in Ghose and Han,
20   they're like:  Oh, well, they have to do -- they have to have,
21   you know, more cloud storage.
22        Well, the thing is, you know, for Consumers 1 through,
23   you know, 500,000, their storage is fine; but when they get to
24   a certain level of consumers, they need to buy some more.  So
25   their marginal costs goes shooting up for a few consumers, and
```

1   then it's going to be zero again because they don't need it;

2   they've purchased it.  There's no more incremental costs

3   associated with that.

4       And part of this is just the math.  You know, this is --

5   the math is driving our choice of how we think about these

6   costs.

7       But I want -- I just want to say that this is not -- I

8   don't think that -- we shouldn't be disagreeing about this

9   because this issue is in Dr. Singer's report and it is in his

10  deposition testimony.

11      **DR. SINGER:**  Can I clear that up, Your Honor?

12      **THE COURT:**  No.  That's it for today.

13      Let me ask you this.  Look, I have the reports.  I spent a

14  lot of time with them.

15      I want to close out.  Are there any questions from

16  attorneys, which I will screen, but you can certainly ask them?

17      One per side.  Who's going to do the plaintiffs?

18      **MS. GIULIANELLI:**  I will be asking the questions.

19      **THE COURT:**  Come on up.

20      And who's going to do the defendant?

21      **MR. RAPHAEL:**  I will, Your Honor.

22      **THE COURT:**  Okay.  Come on up.  You can make your

23  appearance.

24      **MS. GIULIANELLI:**  Good afternoon, Your Honor.  It's Karma

25  Giulianelli for the consumer plaintiffs.

```
 1        MR. RAPHAEL:  Good afternoon, Your Honor.  Justin Raphael
 2   from Munger, Tolles & Olson for Google.
 3        THE COURT:  Okay.  Ms. Giulianelli, what would you like to
 4   ask?
 5        MS. GIULIANELLI:  Well, I suppose it depends on how much
 6   time I have; so I'm going to be very selective here.
 7        THE COURT:  All right.  What's the first topic?
 8        MS. GIULIANELLI:  The first topic, very briefly because I
 9   am not sure that we got there, but Dr. Burtis mentioned that
10   Dr. Singer did not -- his model did not take into account focal
11   point pricing.
12        So I would just like to give Dr. Singer the opportunity to
13   explain --
14        THE COURT:  You can ask your opponents, not your own
15   witness.
16        MS. GIULIANELLI:  Aah.  Okay.
17        THE COURT:  Do you have any questions for Dr. Burtis?
18        MS. GIULIANELLI:  In that case, I do.
19        THE COURT:  Yeah.  What's the first one?
20        MS. GIULIANELLI:  Dr. Burtis, we put up Slide -- let's go
21   back to -- I think it was your Slide 14, and this was your
22   analysis --
23        THE COURT:  14?
24        MS. GIULIANELLI:  I think it was Dr. Burtis's Slide 14.
25        THE COURT:  Okay.
```

1      **MS. GIULIANELLI:**  And it was --

2      **THE COURT:**  The 2 percent slide.

3      **MS. GIULIANELLI:**  Yes.  And it was Dr. Burtis's analysis

4  of the different take rates.

5      And we talked about iHeartRadio; right?  And I just want

6  to talk about a couple of things there.

7      Am I right that you looked at pricing from SKU data on the

8  apps?  Correct?

9      **DR. BURTIS:**  Yes.  I looked at a -- the price of a SKU.

10     **MS. GIULIANELLI:**  And am I right that a given developer

11  could have hundreds of SKUs, even though it might offer a much

12  smaller number of products?

13     So for Tinder, for example, you know, I think from

14  Dr. Singer's reply report that there are just three major

15  subscription categories, but Tinder can have over 500 SKUs.

16  Correct?

17     **DR. BURTIS:**  That is highly variable across these

18  developers.  Some have a single SKU.

19     **MS. GIULIANELLI:**  Okay.  So let's look at iHeartRadio.

20  So iHeartRadio, if you want to go to your Slide 16 and then

21  17, now, the reason you had 5.99 on Slide 16 and then 4.99 for

22  iHeartRadio on Slide 17 is because there were different SKUs

23  in the database for the iHeart Plus program; right?

24     **DR. BURTIS:**  That's correct.

25     **MS. GIULIANELLI:**  Correct.

```
1         And the way you looked at it, you couldn't tell if those

2    5.99 SKUs that remained there were SKUs for existing

3    subscribers to the Plus program before Google entered into the

4    agreement pursuant to a special program agreement, audio

5    developer program agreement with iHeartRadio in July of 2017;

6    correct?

7         DR. BURTIS:  No.  Actually, that's not correct.

8         MS. GIULIANELLI:  Okay.  So if you -- so do you know, did

9    you look at the iHeart Plus -- the line and how much was

10   iHeart Plus -- did you go and look at the Web or anything

11   like that from iHeartRadio in, let's say, 2019, what was the

12   price that was being offered as of that date?  Do you know?

13        DR. BURTIS:  I'm sorry.  On the Web?

14        MS. GIULIANELLI:  Yes, or anywhere.  What was

15   iHeartRadio selling iHeart Plus for, if you know, in 2019?

16        DR. BURTIS:  I don't know, as I stand here.

17        MS. GIULIANELLI:  Okay.  And you don't know because you

18   looked at it at an individual SKU level, and so you don't know

19   if the 5.99 SKUs in the transaction database were there from

20   existing subscribers -- correct? -- before the agreement with

21   Google?  Am I right about that?

22        DR. BURTIS:  No, you're wrong about that.

23        MS. GIULIANELLI:  Okay.  Could you explain that, please.

24        DR. BURTIS:  Sure.  So in the transactions data, for a

25   given transaction, there's information about the SKU, about the
```

1    price, and about the service fee rate.

2        So this is matching -- the graph, the line graph is

3    matching the consumers who are paying whatever that price is --

4    I'm sorry.  I can't see it from here -- and the service fee

5    rate associated with them.

6        **MS. GIULIANELLI:**  Okay.  So the line graph is matching

7    only those consumers who are paying 5.99, but that's for that

8    particular SKU, not for the entire iHeart Plus product;

9    correct?

10       **DR. BURTIS:**  I looked at it on a SKU-by-SKU basis so I

11   could isolate what happens to individual SKUs, you know, when

12   that SKU service fee rate changes.  That's true.

13       **MS. GIULIANELLI:**  Okay.  And if there were -- and this

14   would infect not just iHeartRadio but, for instance, Pandora

15   and other applications that you looked at too?

16       **DR. BURTIS:**  Well, I wouldn't say it infected anything.  I

17   mean, I'm matching the service fee rate to the price.  So

18   I think that's the right way to do it.

19       **MS. GIULIANELLI:**  And when you talk about the service fee

20   rate to the price, you did look at the websites, I think,

21   because you've got here Slide 17.  Did you put this together

22   yourself?  And did you look at these websites for Minecraft and

23   Pandora and all these things on Slide 17?

24       **DR. BURTIS:**  Some of them, I did.

25       **MS. GIULIANELLI:**  Okay.

1          **DR. BURTIS:**  Actually, some of them are taken from,

2     I think, Dr. Singer's report.  So...

3          **MS. GIULIANELLI:**  Yeah.  The ones on the --

4          **THE COURT:**  If I may, something a little bit more method

5     and reliability would be more useful to me.

6          **MS. GIULIANELLI:**  Okay.  And, Your Honor, I think the

7     reason that I'm asking about this is because:

8          Am I right, Dr. Burtis, that one of your critiques of

9     Dr. Singer's model is that it's not reliable because you say

10    that the analysis that you've done here of changes in SKUs in

11    the way you've looked at it shows that they're not passing on

12    cost savings?  That's one of the reasons that you say his

13    analysis is not reliable.  Am I right about that?

14         **DR. BURTIS:**  I think that my analysis -- I mean, I don't

15    know if I would say it that way.  It certainly confirms the

16    problems that I have found with the reliability of his model.

17         **MS. GIULIANELLI:**  And if there's a flaw -- and we've

18    already talked about, I think, somewhat the subscriptions,

19    which is that with the subscriptions, developers can't change

20    the pricing in the second year without also impacting the first

21    year.  So let's set that aside.

22         If there's a flaw in your analysis and you don't pick up

23    the pricing of the product over time because you've looked at

24    it at a SKU level, that would impact that critique that you

25    have of Dr. Singer's methodology; right?

1          **DR. BURTIS:**  I disagree.  I mean, over 400- -- I think

2     it's over 400,000 of the 450,000 SKUs are not subscriptions.

3          So basically, I'm not trying to prove there's no

4     pass-through for every single SKU.  I'm not trying to say that.

5     What I'm trying to say is that we have to look at them

6     individually, and that when you do that, when you look at all

7     of these individual products, you see many of them not

8     responding to service fee rate reductions.

9          **MS. GIULIANELLI:**  At least according to the way you look

10    at it at a SKU level.  You did not look at it at the product

11    level; right?

12         **DR. BURTIS:**  So I think you're confused about that.  I'm

13    not -- whatever.  I'm using --

14         **THE COURT:**  No one is taking you --

15         **MS. GIULIANELLI:**  I think one of us is confused about

16    that.

17         **THE COURT:**  Just tell us why.

18         **DR. BURTIS:**  For me, the SKU is an easy way to say

19    "product" instead of saying "paid app."

20         **THE COURT:**  Can I just -- so --

21         **MS. GIULIANELLI:**  Okay.  I think I've made my point.

22         **THE COURT:**  This Tinder thing with 450 SKUs but three

23    products, how does that work out for you?  Why are you looking

24    at 450 SKUs if the reality for a consumer is three products?

25         **DR. BURTIS:**  Well, I mean, the issue is, Your Honor, what

1    about those consumers who bought this particular SKU or this

2    product?  Did their price go down when the service fee rate

3    went down?  That's what I'm --

4        **THE COURT:**  Well, I know it's getting late.

5        The consumer is buying a product.  They're not buying a

6    SKU; they're buying a product.

7        **DR. BURTIS:**  No.  They are.  They're buying a SKU.

8        **THE COURT:**  I want a date in San Francisco.  That's the

9    product they're buying.  So how does the 450 SKUs factor into

10   that?

11       **DR. BURTIS:**  A SKU is a product.  That's the part I

12   thought that was getting confusing.  It is a product.  It is a

13   very -- it is a very particularly defined product.

14       I go in the database and I say --

15       **THE COURT:**  Can we just pause?

16       So, in your view, a SKU is actually something a consumer

17   is buying?

18       **DR. BURTIS:**  Oh, yes, absolutely.

19       **THE COURT:**  Okay.

20       **MS. GIULIANELLI:**  Do you know, Dr. Burtis, how an app --

21   if I'm, for example, Tinder, you know, iHeart or Pandora, how

22   it changes the price?  It's through the SKU.  But it doesn't

23   change the product, like iHeart Plus program.  It doesn't

24   change that product for consumers.  It's changing the price

25   through the SKU; is that right?

1      **DR. BURTIS:**  If I understand your question, I think

2  you're -- I think the answer is yes, if I understand you.

3      **MS. GIULIANELLI:**  Okay.

4      **THE COURT:**  All right.  How about just a couple more

5  questions, Ms. Giulianelli, and then see if Mr. Raphael -- is

6  that right? -- has questions.

7      **MS. GIULIANELLI:**  I just have only a couple of --

8      **THE COURT:**  Remember, your arguments are all -- is it

9  August 4th?

10      **MS. GIULIANELLI:**  Yes.

11      **THE COURT:**  So you don't have to make them now.

12      **MS. GIULIANELLI:**  I will not.  I will not.

13      **THE COURT:**  Okay.

14      **MS. GIULIANELLI:**  In that case, Your Honor, I've got a lot

15  of questions, but I know when to sit down, and I think it's

16  time.

17      **THE COURT:**  Well, there may be one or two large questions.

18  This is your chance to ask, because you'll never have

19  Ms. Burtis here, short of trial, again.  So is there a larger

20  question?  If there's not, that's okay.  But if there's a

21  larger question, I'd be happy to let you do it.

22      **MS. GIULIANELLI:**  I'm going to sit down.  Thank you.

23      **THE COURT:**  Okay.  All right.  Mr. Raphael?

24      **MR. RAPHAEL:**  Thank you, Your Honor.

25      Just let Dr. Singer find the mic.

1          **THE COURT:**  This is the big-picture portion of the day; so

2     keep to the big picture.  Okay?

3          **MR. RAPHAEL:**  I'll do that, Your Honor.

4          First of all, speaking of big picture, we spent, I think,

5     the first hour discussing the Rochet-Tirole model and the

6     Landes-Posner model.  Do you recall that?

7          **DR. SINGER:**  Yes.

8          **MR. RAPHAEL:**  Do either of those models tell you what the

9     pass-through rate for any consumer or any app is?

10          **DR. SINGER:**  No.  Those models tell you what the but-for

11     take rate would be in the app distribution market for

12     Rochet-Tirole and in the in-app services market for

13     Landes-Posner.

14          **MR. RAPHAEL:**  Right.  And so even if Dr. Burtis agreed

15     with you that the Rochet-Tirole model and Landes-Posner model

16     were done 100 percent correctly, that wouldn't tell you or

17     anyone else anything about whether there would be pass-through

18     for any consumer; correct?

19          **DR. SINGER:**  That is correct.  The pass-through is an

20     input that is required in Rochet-Tirole but only, Your Honor,

21     when we do that one path where we're solving for the but-for

22     take rate.

23          If we allow Google to respond to the advent of competition

24     by enhancing its subsidy, as it did in Korea and Japan, holding

25     the take rate constant, we don't even need pass-through to get

1    to consumer injury.

2        **MR. RAPHAEL:**  Now, Dr. Singer, in the real world, Google

3    reduced service fees for a number of developers on a number of

4    occasions during the class period; correct?

5        **DR. SINGER:**  I'll grant you a very limited number of

6    occasions.  There were 50 in the LRAP program that got a

7    special arrangement for LRAP.  And then, of course, we talked

8    about the subscription products in Year 2 and, of course, the

9    small developers for the first million dollars.  So those are

10   important deviations from the base -- from the headline

11   30 percent take rate, yes.

12       **MR. RAPHAEL:**  Well, in fact, there were -- I think

13   Dr. Burtis analyzed over 450,000 times in which a service fee

14   was reduced for something.  Is that right?

15       **DR. SINGER:**  Well, but that's a trivial percentage of the

16   total number of SKUs in the database.  Now, her flawed SKU

17   analysis is missing out on changes in prices when the app

18   introduces the new price through a new SKU.  Now, she's fixated

19   on the old SKU and she doesn't see the price changing of 5.99

20   when, in fact, there's a new price in town at 4.99 that just

21   got introduced through a new SKU.

22       **MR. RAPHAEL:**  Dr. Singer, for how many products did you

23   analyze, when the service fee went down, whether the price

24   changed in the way that Dr. Burtis did?

25       **DR. SINGER:**  I made the determination that, given the

 1   limited variation in the take rates -- remember, 92.4 percent
 2   of the transactions are always at 30; right? -- and then when I
 3   learned about the impediments that Google threw up in terms of
 4   subscription products not being able to drop their prices and I
 5   learned that many -- and I was cognizant of the fact that many
 6   of these drops occurred way late in the class period, some of
 7   them in 2021, 2022, we're trying to simulate a world where we
 8   have a permanently lower reduction in take rate from Day 1 back
 9   in.  Right?

10        And so I looked at that and I made the determination that
11   that was the wrong path to go down.  I decided that I needed to
12   characterize the demand the developers faced, and I went out
13   and tested logit, linear --

14        **MR. RAPHAEL:**  Dr. Singer, I asked you how many times --
15   for how many products you analyzed when the service fee went
16   down, whether the price changed.  Is the answer to my question
17   zero?

18        **DR. SINGER:**  In my initial report, the answer is zero; but
19   because I wrote a reply report, I had to do an analysis of the
20   botched experiment in Dr. Burtis's report.

21        **MR. RAPHAEL:**  Thank you, Dr. Singer.

22        Now, Dr. Singer, your formula is based on a logit demand
23   model?

24        **DR. SINGER:**  My pass-through formula is based on the logit
25   demand model that I tested and confirmed best characterizes the

1   demand faced by apps.

2       **MR. RAPHAEL:**  Right.  And one feature of a logit demand

3   model is that all goods in the market where demand is being

4   measured are substitutes; is that right?

5       **DR. SINGER:**  I think that all goods have to be substitutes

6   to some extent.  And that could be a very light extent.  There

7   could be --

8       **MR. RAPHAEL:**  In fact, it's very particular, isn't it,

9   Dr. Singer?  In a logit model, all of the goods in the market

10  being studied have to be substitutes in proportion to their

11  shares of that market; isn't that correct?

12      **DR. SINGER:**  I think that's fair, yes.

13      **MR. RAPHAEL:**  And is it your opinion in this case that all

14  apps in every Google Play category are substitutes in perfect

15  proportion to their share?

16      **DR. SINGER:**  Not in perfect proportion.  But the P-values

17  on that coefficient that relates price or predicted price -- we

18  use tax rates, Your Honor, to predict a price in Stage I as an

19  instrument -- on the apps share, every one of them with the

20  exception of transportation was statistically significant at

21  the highest levels.  That's telling you that the prediction of

22  a logit is true in this case.  It didn't have to be true.  And

23  had I gotten the wrong sine or insignificant coefficients, I

24  would have gone looking for a different demand system.

25      **MR. RAPHAEL:**  Dr. Singer, is it your opinion that every

1    app in each Google Play category is a substitute?

2       **DR. SINGER:**  I don't think that every one is a good

3    substitute necessarily.  I think Microsoft Excel and Microsoft

4    PowerPoint are in the productivity category.  Does that mean

5    the category is defined insanely?  No, because Microsoft has a

6    cluster or a package of productivity apps that goes up against

7    Google's package of productively apps.

8       So it doesn't surprise me that you can find some silly

9    examples -- Thomas the Train and Doom -- you can find some

10   silly examples that probably aren't close.  But if you're right

11   and that's what generally characterizes the data, that is, if

12   Google just willy-nilly slapped these categories together and

13   you just have a random collection of apps, then when I go to

14   estimate the logit model, Your Honor, the fit, the goodness of

15   fit would be zero.  The P-values -- right? -- wouldn't be as

16   good as they are.  They wouldn't be statistically significant.

17      That's confirmation that the categories, as designed by

18   Google in the ordinary course of business, which is also very

19   similar to what Apple's categories looked like, are meaningful.

20   They are a meaningful arena of competition around which one can

21   use for estimating shares for the logit model.

22      **MR. RAPHAEL:**  But they're not substitutes, are they?

23      **THE COURT:**  I don't have a problem with that.  I think

24   that's fine.

25      Okay.  One or two more questions, Mr. Raphael.

1        **MR. RAPHAEL:**  Sure, Your Honor.

2        I guess my last question to you, Dr. Singer, is -- I just

3    want to confirm this -- is that you've never used the formula

4    that you used in this case to calculate pass-through in any

5    other case.  That's correct?

6        **DR. SINGER:**  I think -- I think what I told you in my

7    deposition -- and same answer now -- is that I've been doing

8    mostly monopolization.  I've been blessed, including in the

9    pork case, to have variation in the wholesale rates so that I

10   could exploit that variation by going and looking at changes in

11   retail prices.

12       When you're confronted with a new empirical problem or

13   puzzle, you can't always go back to the thing that you've done

14   in the past.  Sometimes you have to have a new tool.  And

15   fortunately, economics has given us the perfect tool for this

16   kind of problem.

17       **THE COURT:**  Well, I think the point is, for me at least,

18   is total novelty is always -- judges don't like it.

19       **DR. SINGER:**  It's not total novelty, Your Honor.  The

20   logit is one of the most commonly used --

21       **THE COURT:**  I know the logit is, but not the way it's

22   being used here.  I'm not saying it's an indictment, but it

23   does require a little more explanation.

24       **DR. SINGER:**  I think that --

25       **THE COURT:**  Okay.  I'm going to have you all in -- I think

 1    it's August 4th.

 2        Let me just tell you a little tentative, non-binding

 3    tentative, subject to considerably more thinking and, of

 4    course, your presentations when you come back in August.

 5        But I am not particularly concerned that this is

 6    inadmissible -- all right? -- with one exception, and that is I

 7    do want to hear a little bit more about logit and the inputs

 8    and how it's working.  On the whole, though, I think the method

 9    is -- right or wrong -- certainly sound enough for a trier of

10    fact to have a decision on whether they buy it or not.

11        I am much more interested in hearing -- so it's perfectly

12    fine, and I'll take any *Daubert* arguments you have, but I do

13    want to hear more about logit.  It gives me a little bit of

14    pause.

15        I do want to hear much more about the commonality issues

16    for Rule 23 purposes when we get back together.  On the

17    two-sided platform, I'm comfortable, I think, with the

18    developer side and the figures -- the unitary figure for that

19    side.  I think that makes sense based on the evidence that I've

20    seen.  Whether it's persuasive to a jury is a different matter,

21    or me later.  That's fine.  This is just getting through class

22    certification.

23        I am much less confident in the method for determining

24    what I'll call antitrust injury to the consumers.  I'm not sold

25    that this method is going to be sufficient on a class-wide

basis for all of the millions of people, tens of millions of
people that are going to be in these proposed classes.  So I
would like to hear more about that.

     This is in addition to anything else you want to raise.

     I'm also looking at a couple of other issues.  This is a
massively huge class, Ms. Giulianelli.  I mean, I think it's
what?  Is it 90 million people possibly?  That would be a
historically large class, and I need to understand how that
fits into manageability and the core Rule 23 inquiry, which is:
Does this make sense to do in one case?  I'm not clear on why
that may be the right answer here.

     I'm also -- I don't understand how this will translate
into a reasonable approximation of damages for all of the
disparately situated individual consumers.  It's one thing --
even if you get past the number, I don't know how you're going
to actually calculate the checks for people who may have
purchased one swim app, and that's it, versus someone who
spends 100, 200 dollars a year on a game app.  It's not clear
to me how that's going to work.  That all has to be taken into
account for manageability.

     So those are the things that I'd like to hear more about
when we get to class certification.

     I'm also a little bit unclear about this division with the
states.  I don't really understand what's happening and how
that's working out.  So you're going to have to walk me through

1    that, why that makes sense from a Rule 23 perspective.

2         And even if damages don't work, I mean, I think there's

3    clearly enough for an injunction case to go forward.  But

4    whether the right remedy is a check to 90 million Americans is

5    a little less clear to me.

6         Okay?  So that's just a little bit of a preview for

7    August 4th.

8         And anything else for today?

9         **MS. GIULIANELLI:**  No, thank you.

10        **THE COURT:**  Plaintiffs?

11        **MS. GIULIANELLI:**  We will be prepared to walk you through

12   every single one of those.

13        **THE COURT:**  Good.  Defendants?

14        **MR. RAPHAEL:**  No.

15        **THE COURT:**  All right.  Thank you.  It was quite useful.

16        **DR. SINGER:**  Thanks, Your Honor.

17        **THE COURT:**  Thanks for coming in.

18        Okay.  I'll see you then.

19                  (Proceedings adjourned at 4:48 p.m.)

20                          ---o0o---

21

22

23

24

25

1

2 <u>**CERTIFICATE OF REPORTER**</u>

3      I certify that the foregoing is a correct transcript

4 from the record of proceedings in the above-entitled matter.

5

6 DATE: Thursday, July 21, 2022

7

8

9 _____

10 Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
        Official United States Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF SERVICE

I hereby certify that, on December 19, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED: December 19, 2022          /s/ *Hae Sung Nam*
                                                      Hae Sung Nam

                                                      Attorney for
                                                      Plaintiffs-Respondents